**MIDDLETOWN CONCRETE PRODUCTS, INC., a Delaware corporation, Plaintiff,**

**v.**

**BLACK CLAWSON CO., an Ohio corporation, and Hydrotile Machinery Co., an Iowa corporation, Defendants.**

**Civ. A. No. 90–668 MMS.**

United States District Court, D. Delaware.

Aug. 28, 1992.

James S. Green and Mark E. Steiner of Duane, Morris & Heckscher, Wilmington, Del., for plaintiff.

Carl Schnee, and Joseph Grey of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del.; Robert Braunschweig and Richard C. Raymond, of Braunschweig Rachlis Fishman & Raymond, P.C., of counsel, for defendants.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

On October 11, 1990, Middletown Concrete Products, Inc. ("MCP") filed a complaint against Black Clawson Co. ("Black Clawson") and Hydrotile Machinery Company ("Hydrotile") over the sale of machinery for which the contract price exceeded $2,000,000. Before the Court now in this diversity action is MCP's motion for summary judgment on counts I and II and defendants' motion for summary judgment on all counts. The parties agree that the contract claims are governed by Iowa law and the tort claims are governed by Delaware law. This Court has jurisdiction under 28 U.S.C. § 1332.

For the reasons that follow, MCP's motion for summary judgment will be denied; Hydrotile's motion for summary judgment will also be denied.

## I.

In 1988, Kenneth Kershaw ("Kershaw"), Joseph J. Corrado ("Corrado"), Stephen A. Cole ("Cole"), Frank Corrado, Leonard Iacono ("Iacono"), Arnold Boyer ("Boyer") and Verino Pettinaro, all of whom are Delaware contractors, formed and became shareholders in Middletown Concrete Products, Inc., a precast concrete manufacturing plant in Middletown Delaware. (App. to Pl.'s Opening Br. (Docket Item 26) [hereinafter "Dkt."] at A–189–90). Each of the founders is an experienced businessman. Boyer invested approximately $500,000 (App. to Def.'s Opening Br., Dkt. 29 at A–107), and subsequent investments by Kershaw and Corrado have brought their investments in MCP to approximately $1.3 million each. (Dkt. 29 at A–173–4; A–133–34). MCP's primary product was to be concrete pipe.

In March of 1989, MCP entered into a series of contracts (the "Contracts") with Hydrotile, a wholly owned division of Black Clawson, under which defendants agreed to sell to MCP a machinery system to manufacture concrete pipe (the "System"). The System consisted mainly of two parts: (1) the Multipak/Neptune machine (the "Neptune") and the Rekers Off-bearing System (the "Rekers"). On August 8, 1989, MCP entered into an additional contract with Hydrotile for the purchase of equipment for the production of elliptical concrete pipe.

Apparently, the parties' relationship began when David Mack ("Mack"), Hydrotile's regional sales manager, visited Corrado to discuss the generalities of the pipe manufacturing business as well as Hydrotile's products. (Pl.'s Opening Br., Dkt. 25 at 5; Dkt. 26 at A–200–202). In June, 1988, Darryl Haar ("Haar"), vice president and marketing manager for Hydrotile, and Mack visited Corrado again and showed VCR tapes of various pipe making machines as well as of the Rekers. (Dkt. 26 at A–131).

At one of the meetings in 1988, Mack gave Corrado a promotional brochure for the Neptune. Part of this brochure contained a list of rates at which the Neptune could produce various sizes of pipe. (Dkt. 26 at A–17; A–202–203).

During the summer of 1988, representatives of MCP and Hydrotile together visited various pipe manufacturing plants in the United States and Canada. (Dkt. 26 at A–65–66; A–80; A–175). MCP's representatives observed the operation of machinery produced by a variety of machinery manufacturers and had an opportunity to talk to the various pipe producers who were using this machinery. (Dkt. 26 at A–67; A–80–83; A–132). During one of these visits, MCP learned that in Florida a Saturn machine (Hydrotile's predecessor to the Neptune) had experienced difficulties in starting up. When asked about the Florida plant, Boyer testified in deposition: "[I]n a nine-month period down there they had never got that thing up to producing anywhere near what they had expected." (Dkt. 29 at A–115).

During the July, 1988, tour, MCP viewed certain features of other Hydrotile equipment, some of which belonged to predecessors of the Neptune machine (Dkt. 29 at A–164–65; A–166), but the Neptune itself was not yet in production in any plant at that time. (Dkt. 29 at A–125; A–157). Consistent with its policy, Hydrotile did not conduct production testing for the Neptune. (Dkt. 29 at A–147–48).

At the time of the tour, MCP was considering purchasing concrete pipe manufacturing machinery from the Hawkeye Machinery Company ("Hawkeye") as well as from Hydrotile. (Dkt. 26 at A–83). MCP also considered equipment available from other suppliers. (Dkt. 26 at A–80–83; A–204).

In August of 1988, Hydrotile and MCP intensified negotiations for the purchase of a highly automated system. On August 11 and 12, 1988, Mack and Haar met with MCP to go over Hydrotile's quote for the System. (Dkt. 26 at A–83). Although experienced businessmen, none of the shareholders of MCP had ever purchased pipe making machinery before. (Dkt. 26 at A–

73). Among other things, Haar and Mack discussed proposed plant layouts. (Dkt. 26 at A–133). The parties also discussed pipe quality, production rates, and changeover time. (Dkt. 26 at A–180–181).

During this meeting Corrado and other shareholders of MCP shared with Haar concerns they wanted satisfied before purchasing the System from Hydrotile. (Dkt. 26 at A–84–85). At the time of the meeting MCP was concerned about the Neptune's performance as Neptune had not developed a track record and as another company was experiencing problems with the Neptune's predecessor, the Saturn. (Dkt. 26 at A–84–85). Accordingly, MCP requested that Hydrotile guarantee production rates. (Dkt. 26 A–90–98). Indeed, MCP was "screaming" and "shouting" about the production guarantee's importance. (Dkt. 29 at A–123A). MCP also requested that Hydrotile accept different payment terms than those proposed by Hydrotile, and agree to buy back the System if it did not perform satisfactorily. (Dkt. 26 at A–84–87; A–134; A–213–14). After initially dismissing MCP's requests as "out of the question," Haar agreed to discuss the requests with his superiors. (Dkt. 26 at A–135–36).

On August 24, 1988, Haar returned to MCP with David Fell ("Fell"), corporate operations manager of Black Clawson. Corrado, Cole and Boyer attended this meeting on behalf of MCP. (Dkt. 26 at A–137). Haar and Fell told MCP that Hydrotile and Black Clawson would not agree to a buy back provision. (Dkt. 26 at A–216–17). MCP never successfully negotiated a buy back stipulation. (Dkt. 26 at A–74–75; A–94).

On August 24, 1988, Haar also told MCP that Hydrotile could not guarantee the production levels in the promotional brochure because actual production levels could depend on a number of factors. (Dkt. 26 at A–88–90; A–218–20). In response to this MCP told Haar to advise MCP of rates Hydrotile would guarantee. (Dkt. 26 at A–90–98; A–219). Specifically, Boyer told Haar and Fell that if they were unwilling to guarantee the rates in their promotion literature, they should pick a number they could live with. (Dkt. 26 at A–69–72; A–76–77). MCP never insisted that Hydrotile guarantee the rates reflected by its advertising. (Dkt. 26 at A–90–96; A–140).

During the August 24, 1988, meeting, Haar also stated that changeovers could be made in about an hour. (Dkt. 26 at A–139). Both Haar and Ronald Schriever, Hydrotile's National Sales Manager, made this representation on several occasions. (Dkt. 26 at A–8–10; A–26–27; A–153–55; A–224). Plaintiff urges that such representations were insupportable because Mack, during his deposition, testified that Hydrotile never attempted to change over any Neptune prior to marketing the machine. (Dkt. 26 at A–236). Also, plaintiffs note Hydrotile's theoretical production rates for the Neptune were calculated partially by extrapolating theoretical production rates of the Saturn. MCP actually experienced changeover times in excess of four to eight hours. (Dkt. 26 at A–236; A–46–48; A–149–52).

On August 30, 1988, Haar, Mack and William Mitchell[1] ("Mitchell") met with Corrado, Boyer and Iacono. (Dkt. 26 at A–34; A–143). The parties discussed production rates. Around the time of the meeting, Haar presented MCP with Hydrotile's definition of "Acceptable Performance" of the System. (Dkt. 26 A–2–7; A–90–97). The definition was in the form of a letter (the "Acceptable Performance Letter") authored by Mr. Haar in response to MCP's demand on August 24. (Dkt. 26 at A–2–7; A–222; A–242). The production rate listed was less than that contained in Hydrotile's literature.

At the time Haar prepared the Acceptable Performance Letter, no Neptune machine was operating, and the only other machine had been sold to American Concrete Products in Milwaukee. Haar prepared the letter based on prior meetings with a number of Hydrotile engineers and technicians, who developed estimates based on prior generations of Hydrotile machinery. (Dkt. 29 at A–151–54). Hydrotile did

---

1. Mitchell was president of Hydrotile until April 1990 when Michael Knight became president.

not share with MCP the underlying theoretical basis of its estimates.

At the August 30, 1988, meeting, MCP again requested that Hydrotile agree to a "buy-back" or some other type of production guaranty tied to the estimated rates set forth in the August 29 letter. Hydrotile again refused to agree to such a provision. MCP decided to postpone negotiations until it could visit American Concrete where the Neptune was installed and could be observed first-hand. (Dkt. 29 at A-158-61). Corrado and other representatives of MCP traveled to Milwaukee to observe the machine. (Dkt. 29 at A-191). Because the machine was not producing concrete at that time, the MCP representatives could only observe the Neptune "dry cycle" through its phases of operation. (Dkt. 29 at A-191; A-136-37).

In early March of 1989, Kershaw, Boyer and Iacono again visited the American Concrete plant. (Dkt. 29 at A-186). This time the Neptune was producing pipe and MCP representatives had the opportunity to observe the machine in actual production. (Dkt. 29 at A-175-76). During both the November and March visits, MCP representatives discussed the operation of the machine with American's management. (Dkt. 29 at A-137; A-167; A-171-72). At their depositions, Boyer, Iacono and Corrado each testified that MCP was not able to get an accurate figure for the production rates from the American Neptune because American's "batch" plant was located too far away from the Neptune. In other words, the supply of concrete mix to the machine was not rapid enough to allow the Neptune to produce at its full capacity. (Dkt. 29 at A-116-18; A-172; A-137-38).

Plaintiff maintains that although Hydrotile would not agree to make payment contingent upon the System achieving Acceptable Performance, Haar told MCP that such performance levels would be guaranteed by Hydrotile. (Dkt. 26 at A-90-100; A-103-05; A-141-42). Plaintiff further

maintains that it informed Hydrotile representatives that it was relying on these guaranteed Acceptable Performance numbers in making its decision to purchase the System. (Dkt. 26 at A-186-88; A-223).[2]

On March 21, 1989, a meeting was held in Wilmington, Delaware, during which the final negotiations of the Contracts took place. Cole, Corrado and Kershaw were present on behalf of MCP. (Dkt. 26 at A-225). Haar and Mack attended on behalf of Hydrotile. (Dkt. 26 at A-145-46). Cole eventually signed the quotations brought by Haar and Mack. (Dkt. 26 at A-146).

Printed near the top of the first page of each contract was the following:

> We [Hydrotile] hereby offer for a limited period of 30 days following the date hereof the items described below and/or in the specifications, if any consisting of [ ] pages attached hereto. This offer is subject to the terms and conditions contained on this and the other side hereof and in said specifications, if any, and to no others whatsoever.

(Dkt. 29 at A-17, A-20, A-22). On the reverse side of these quotations is boilerplate language denoted as the "Selling Conditions" in which Hydrotile expressly warranted:

> that the equipment manufactured by it shall be free from defects in material and workmanship under normal use and service for a period of 90 days from delivery. Parts claimed and proved to Seller's satisfaction to be defective, shall be replaced or repaired without charge, FOB Nashua, Iowa, provided that immediate notification in writing is given to the Seller. Equipment manufactured by others than the Seller is sold exclusively under such warranty as the manufacturer may give to the Seller and to the extent enforceable by the Seller. THE FOREGOING WARRANTY IS EXCLUSIVE AND IS IN LIEU OF ALL OTHER WARRANTIES (WHETHER WRITTEN, ORAL OR IMPLIED) INCLUD-

---

**2.** The parties dispute whether the performance criteria set forth in the Acceptable Performance Letter became part of the Contracts. For the purposes of MCP's summary judgment motion,

MCP is willing to assume, *arguendo*, that the criteria of the Acceptable Performance Letter are not part of the Contracts. (Dkt. 25 at 9).

ING THE WARRANTY OF MERCHANTABILITY IN OTHER RESPECTS THAN EXPRESSLY SET FORTH ABOVE AND WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. Liability of Seller under this warranty is limited to the repair or replacement of the defective part, all damage claims of whatever nature, including without limitation Buyer's labor costs, being excluded.

(Dkt. 29 at A–21, A–23).

The System was delivered piecemeal beginning in October, 1989, and into January, 1990. By March 21, 1990, the System was installed and ready to manufacture pipe. (Dkt. 26 at A–23–24).

MCP maintains that Hydrotile never repaired or replaced all of the defective parts. Plaintiff maintains that on several occasions MCP tried to coax Hydrotile to repair or replace defects in the system. On April 30, 1990, Corrado wrote Carl Landegger ("Landegger"), Chairman of Black Clawson, to advise of Hydrotile's failure to deliver and install a System which would adequately perform as promised by Hydrotile. (Dkt. 26 at A–23–24). In response, Landegger assured MCP that Black Clawson stood "one hundred percent" behind the machinery it had sold to MCP. (Dkt. 26 at A–25; A–239–40).

On April 23, 1990, Hinch, the General Manager of MCP, wrote to Knight, the President of Hydrotile, explaining that MCP had been in "constant communication with Hydrotile's Customer Service and Sales Personnel," (Dkt. 26 at A–32), and that therefore, everyone was aware of the problems MCP was experiencing. Hinch also wrote "To date our Reker's system is not complete. RE: pallet cleaning and pallet slide table. When the remaining equipment/parts are installed and our equipment will function as was promised, we will be glad to pay all balances due." (Dkt. 26 at A–32).

In May, 1990, Hydrotile sent Fred Schultz, one of its mechanical specialists, to investigate MCP's complaints. (Dkt. 26 at A–243). Schultz acknowledged that part of the machinery had been prematurely damaged, possibly because it had been improperly fabricated. (Dkt. 26 at A–28–31). Mr. Hinch testified that it was unlikely this damage was due to abuse. (Dkt. 26 at A–163). Schultz also identified a number of other defects with the machine which needed to be repaired or replaced, including the pallet centering mechanisms, pallet centering bars, a dysfunctional air compressor in the Rekers robot, and the top table siper bracket for the 24" set up. (Dkt. 26 at A–28–31; A–161–73). Plaintiff maintains that some of these defects were not timely corrected and some were never corrected by defendants. (Dkt. 26 at A–33; A–169–73).

On May 22–23, 1990, MCP invited Mr. Ronald Schriever ("Schriever"), who had taken Haar's position as national sales manager, to the Middletown plant to evaluate ongoing problems. Schriever toured the plant with Corrado, Cole and Don Bailey,[3] and gave MCP his evaluation. (Dkt. 26 at A–226; A–244–45). Schriever explained that some of the problems, including improper maintenance and inadequately trained personnel, were MCP's problems and not Hydrotile's problems. (Dkt. 26 at A–227–31). Schriever also acknowledged that several of the parts were defective and needed to be repaired or replaced. (Dkt. 26 at A–11–13; A–39–51; A–191–98). Plaintiff maintains that on many occasions MCP was forced to repair defects with the System which should have been repaired by Hydrotile. (Dkt. 26 at A–19–20; A–79).

In July, 1990, Haar, Mack and Schriever met with Corrado and Cole to go over continuing problems. (Dkt. 26 at A–246). Plaintiffs maintain that as of July 13, 1990, Hydrotile had not yet resolved all of the defects with the System outlined by Schultz in May or by Schriever in his June 1, 1990, letter. (Dkt. 234–35).

In July, 1990, Kevin Fee ("Fee"), an engineer who was Director of Technical Services for Hydrotile, initiated a program at

---

**3.** At the time of the tour, Mr. Bailey was MCP's sales manager. Mr. Bailey is presently the general manager of MCP. (Dkt. 26 at A–185).

MCP designed to investigate aspects of the operating procedure in order to improve the System's operation. (Dkt. 26 at A–115). In a July 19, 1990, letter Fee, after visiting the plant and discussing his plans with Dennis Hinch, agreed that the System was still not producing pipe of acceptable quantity or quality. (Dkt. 26 at A–14–16).

Subsequently, Hydrotile and MCP embarked on a joint effort to attempt to get the System to perform acceptably. (Dkt. 26 at A–106–10). The initial aspect of this program included sending MCP's personnel to a "school" held by Hydrotile. (Dkt. 26 at A–118). At "school" the parties discussed the operating procedure of the Neptune machine. After this school, personnel from Hydrotile were to accompany MCP to the Middletown plant and stay for 90 days, or until defects in the System had been adequately repaired or replaced by Hydrotile working jointly with MCP. (Dkt. 25 at 14). Plaintiff contends although several Hydrotile employees did return to MCP, they did not stay more than two weeks and many of the defects in the System were never repaired or replaced. (Dkt. 26 at A–118–19).

In September, 1990, Bailey gave Schriever a list of more than 25 items which still needed to be fixed. (Dkt. 26 at A–19–20; A–111–13; A–123–25; A–247). Plaintiff maintains Hydrotile never repaired or replaced all defective parts on this list. (Dkt. 26 at A–125–26).

## II.

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard is not whether there is literally no evidence for the non-movant, nor is it enough for the non-movant to provide a scintilla of evidence supporting its position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Where the appropriate level of showing is not made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. "*Celotex* made clear that Rule 56 does not require the moving party to *negate* the elements of the nonmoving party's case." *Lujan v. National Wildlife Federation*, 497 U.S. 871, ——, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990).

A court should grant a summary judgment motion when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. From recent Supreme Court cases "it is clear enough ... that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511.

As stated by this Court,

> The filing of cross-motions for summary judgment by the parties does not empower the Court to decide genuine issues of material fact. *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884–85 (3d Cir.1974); *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). Nor is the Court required to grant sum-

mary judgment in favor of one party or the other simply because cross-motions have been filed; genuine issues of material fact may still exist. *Tomalewski,* 494 F.2d at 884–85; *Rains,* 402 F.2d at 245; *Krupa v. New Castle County,* 732 F.Supp. 497, 505 (D.Del.1990). *Anthes v. Transworld Systems, Inc.,* 765 F.Supp. 162, 165 (D.Del.1991).

### III.

Hydrotile first urges MCP's breach of contract and warranty causes of action fail as a matter of law because the contracts exclude the terms on which these claims are based. Count I alleges that Hydrotile breached its contract with MCP because the pipe-making equipment that it delivered pursuant to the Round Pipe Contract produces pipe at the rate of 34 pipes per hour rather than 54 pipes per hour that had allegedly been represented. Count II alleges that Hydrotile "expressly" warranted that it would repair or replace that equipment which did not meet the performance standards contained in the unsigned August 29, 1988, letter, and that Hydrotile breached this warranty. Count IV alleges that the Elliptical Pipe Contract required the equipment to make two elliptical pipes at a time and that this provision was breached. Hydrotile argues that because the written contracts each contain a written integration clause, and because it is undisputed the written contracts do not warrant or guarantee *any* particular production rate nor specify that the elliptical equipment could be used two at a time, settled principles governing parol evidence require judgment in Hydrotile's favor.

The parol evidence rule has been codified in Iowa's Uniform Commercial Code ("UCC").[4] Iowa Code Annotated section 554.2202 states:

> 554.2202 Final written expression—parol or extrinsic evidence
>
> Terms with respect to which the confirmatory memoranda of the partes agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> a. by course of dealing or usage of trade (Section 554.1205) or by course of performance (Section 554.2208); and
>
> b. by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Iowa Code Ann. § 554.2202 (West 1991).

In determining the applicability of the parol evidence rule, a court must first determine whether there is an integrated[5] agreement. *See Restatement (Second) of Contracts* § 209(2) at 115 (1981). If a court concludes there is no integration, the parol evidence rule does not apply and evidence of contradictory prior or contemporaneous agreements may be introduced. "An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement." *Id.* at § 209(1). Professor Farnsworth has noted, "[n]o particular form is required for an integrated agreement, and the writing need not be signed by either party." E. Allan Farnsworth, *Contracts* § 7.3, at 471 (2nd ed. 1990) (footnotes omitted) [hereinafter

**4.** "'Few things,' wrote Professor Thayer, 'are darker than ... [the parol evidence rule] or fuller of subtle difficulties'; and this condition of the law all members of the profession will concede. Two circumstances appear to be responsible for it—first, an inherent necessity for certain distinctions, simple in themselves but subtle and elusive in their application, and secondly, the unfortunate prevalence of a terminology in which the subject cannot possibly be discussed with entire accuracy and lucidity. With these two features as marked as they are, it is not strange that the so-called parol evidence rule is attended with confusion and obscurity which make it the most discouraging subject in the whole field of evidence." John Henry Wigmore 9 *Evidence* § 2400 at 3 (Chadbourn rev. ed. 1981).

**5.** While the U.C.C. does not use the phrases, "partially integrated" or "fully integrated," it uses the terms, "final expression" which is comparable to "partially integrated" and "complete and exclusive statement" which is comparable to "fully integrated."

Farnsworth]. "Whether a writing has been adopted as an integrated agreement is a question of fact to be determined in accordance with all relevant evidence." *Restatement (Second) of Contracts* § 209 cmt. c.[6] Case law explaining how courts actually determine the intent of the parties is scant. Often courts simply assume a contract is integrated and move on to determine whether that contract is merely final as to the terms it contains or is the complete and exclusive final agreement of the parties.

Although nothing in the UCC indicates what a court is to consider, there are certain general principles that should guide a court in determining whether the parties intended a writing to be a final expression of their agreement. Professor Farnsworth, for instance, has observed that "the intention of the parties is determined from all the circumstances, including their language and other conduct, just as intention is determined for any other purpose." Farnsworth, § 7.3 at 472. Although the writing itself is useful in determining intent, Professor Corbin cautions, "No written document is sufficient, standing alone, to determine [if a writing is an integration], ... however long and detailed it may be, however formal, and however many may be the seals and signatures and assertions." 3 Arthur Linton Corbin *Corbin on Contracts* § 573 at 360 (1960) [hereinafter *Corbin*]. The Court of Appeals for the Ninth Circuit has emphasized: "In deciding whether a writing is final the most important issue is the intent of the parties." *Sierra Diesel Injection Service v. Burroughs Corp.*, 890 F.2d 108, 112 (9th Cir. 1989) (interpreting Nevada's codification of

2–202 which is substantially similar to Iowa's codification of the same).

In this case defendants have identified three documents which they maintain constitute the "contracts." The first writing, # 149, involves the sale of an Hydrotile/Rekers Automatic Offbearing System and Cured Pipe Handling System. The second writing, # 148, involves the sale of kiln cars, a car moving system, and a hydraulic pumping unit. The third writing, # 146, involves the sale of a Hydrotile Multipak/Neptune Concrete Pipe Machine, form mounted cage positioner controls, equipment required to run round pipe, and equipment to produce 15″ through 42″ R–4 Forsheda 138 joint pipe. Defendants maintain the three writings constitute the complete and exclusive final expression of the parties' agreement. Plaintiff, on the other hand, disputes that the three writings were ever integrated in the first place. Plaintiff argues that when presented with documents # 146, # 148, and # 149, it refused to sign them unless defendants agreed that the 1988 Acceptable Performance Letter was part of the contracts. Plaintiff further argues that only after it received assurances that the documents would be part of the contracts between the parties, did it sign the documents # 146, # 148, and # 149.[7] Therefore, plaintiff urges neither party intended documents # 146, # 148, and # 149 to be the final expression of their agreement; rather, the final agreement between the parties was meant to include documents # 146, # 148, # 149, *and* the Acceptable Performance Letter.[8]

The facts, however, ultimately belie plaintiff's position. First, plaintiff's principals are sophisticated businessmen who ne-

---

**6.** Comment c to section 209 of the Second Restatement notes, "[o]rdinarily the issue whether there is an integrated agreement is determined by the trial judge in the first instance as a question preliminary to an interpretative ruling or to the application of the parol evidence rule." *Restatement (Second) of Contracts* § 209 cmt. c (1981).

**7.** Defendants vehemently deny that they ever gave such assurances.

**8.** In its brief plaintiff argues because it is generally recognized that any warranty disclaimer or exclusion that is inconsistent with an express

warranty is ineffective and inoperative to the extent of such inconsistencies, the Acceptable Performance Letter should be given effect. (Dkt. 31 at 28). To the extent the Acceptable Performance Letter is an express warranty, *see* Iowa Code Ann. § 554.2313, the letter did not constitute a basis for the bargain as the contracts included an express disclaimer of all warranties other than those expressly contained in the contracts. See *Arkwright–Boston Mfrs. Mut. v. Westinghouse Elec.*, 844 F.2d 1174, 1182 (5th Cir.1988).

gotiated with defendants for several months. Second, the relative bargaining strengths of the parties were commensurate. Third, each of the writings is signed by an MCP representative and dated March 21, 1989. Fourth, on the reverse side of the contracts is a pre-printed limitation of warranties which reads:

> THE FOREGOING WARRANTY [that the equipment will be free from defects in material and workmanship under normal use and service for a period of 90 days from delivery] IS EXCLUSIVE AND IS IN LIEU OF ALL OTHER WARRANTIES (WHETHER WRITTEN, ORAL OR IMPLIED) INCLUDING THE WARRANTY OF MERCHANTABILITY IN OTHER RESPECTS THAN EXPRESSLY SET FORTH ABOVE AND WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

(Dkt. 29 at A–23). Fifth, also on the reverse side of each writing is the following pre-printed merger clause:

> There are no rights, warranties or conditions, express or implied, statutory or otherwise, other than those herein contained. This agreement between Buyer and Seller can be modified or rescinded only by a writing signed by both parties. No waiver of any provision of this agreement shall be binding unless in writing signed by an authorized representative of the party against whom the waiver is asserted and unless expressly made generally applicable shall only apply to the specific case for which the waiver is given.

(Dkt. 26 at A–23). On the date the Contracts were signed, plaintiff sent Hydrotile a letter reading as follows:

> Please accept our order per you're Sales contracts 146, 148, 149 this date.
>
> We reserve the right to have the sales contracts read and cause remedy to lan-

guage before the close of day Thursday, March 23, 1989.

(Dkt. 29 at A–16). The letter was acknowledged through signature by Haar, a Hydrotile representative. Above Haar's signature is the caption: "Accepted." Therefore, the contracts consisted of the three documents plus any modifications made during the three-day period of March 21, 1989, to March 23, 1989.[9] Sixth, the entire set of documents were reviewed by plaintiffs' counsel.[10] Accordingly, the only reasonable inference to be drawn from the facts is that the parties intended the three writings and any modifications made between March 21 and March 23, 1989, to constitute the final expression of the parties as to those terms contained therein.

Having determined that writings # 146, # 148, and # 149 are final expressions, the parol evidence rule has some application. The next question the Court must address is whether the writings constitute merely the final expression of the parties' agreement as to the terms contained in each writing, or the complete and exclusive final expression of the parties' agreement. As explained by Professor Murray:

> (1) if the parties intend their written expression of agreement to be merely *final*, the terms of that final agreement may not be *contradicted* by any prior or contemporaneous oral agreement. (2) Such terms in a final writing may, however, be explained or supplemented by evidence of consistent additional terms or by evidence of course of dealing, usage of trade or course of performance. (3) If the parties intended their writing to be not merely *final* but also a *complete and exclusive* statement of the terms of their agreement, evidence of consistent additional terms is excluded, but even with respect to such a complete and exclusive expression of agreement, evidence of trade usage, course of dealing, and course of performance is admissible.

---

**9.** Neither party has suggested that the Acceptable Performance Letter was made a part of the Contracts during the three day window.

**10.** At oral argument the Court asked counsel for plaintiff if the acceptable performance letter could be made part of the contract. Counsel

responded: "I assume our firm could. I assume that our client could.... Certainly it could have been stapled on; it could have been referred to therein or it could have been discussed separately, as some of the other modifications ... were." (Dkt. 39 at 35).

There is, therefore, no presumption that the writing is the complete and exclusive expression of the parties' agreement. Rather, the opposite is assumed, i.e., the writing will not be viewed as complete and exclusive unless the court finds that the parties intended it to be complete and exclusive.

John Edward Murray, Jr., *Murray on Contracts* § 84, at 394–95 (3d ed. 1990) (emphasis in original) (footnotes omitted).[11]

The test for determining whether the writing is complete and exclusive is found in Comment 3 to section 554.2202 of the Iowa Code which reads in pertinent part: "If the additional terms are such that, if agreed upon, they *would certainly* have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact." Iowa Code Ann. § 554.2202 cmt. 3 (emphasis added).[12]

▇ Defendants argue the presence of the three separate merger clauses in each

of the three writings should, as a matter of law, determine that the writings were the complete and exclusive agreement between the parties. Defendants cite *Montgomery Properties Corp. v. Economy Forms Corp.*, 305 N.W.2d 470 (Iowa 1981), for the proposition that because each of the contracts contains an integration clause, the Court should conclude that the parties intended the written contract "as the final and complete expression of the agreement." (Dkt. 28 at 16). In *Montgomery Properties*, the Supreme Court of Iowa held that in an integrated agreement involving a handcrafted integration clause in a contract between sophisticated parties of equal bargaining strength, the existence of the integration clause is controlling on the issue of whether the written contract is the whole integrated agreement, so as to exclude parol evidence on the issue. *Id.* at 476. In 1986, the Iowa Supreme Court made clear, however, that *Montgomery*

---

**11.** As explained by one commentator:

Finality means merely that the writing is final as far as it goes. It cannot be contradicted but there is no bar to the proof of additional consistent terms. Exclusive means that the writing was intended as the memorial of the total agreement. As the writing states "everything" it necessarily follows that a term not included in the writing cannot be proven by parol evidence, without regard to whether the term could be considered consistent with the writing.

Of necessity, "exclusive" also embraces "finality." A determination that a particular writing is the exclusive statement of the agreement of the parties necessarily implies that it is the final statement of that agreement. In contrast with the incomplete final writing that can be supplemented by proof of unwritten terms, the exclusive writing cannot be supplemented by proof of any term, as the writing is the total agreement and excludes any supplementation.

2 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 2–202:20 at 146 (3d ed. 1982) [hereinafter *Anderson*].

**12.** The Official Comments to section 544.2202 reads in its entirety as follows:

1. This section definitely rejects:

(a) Any assumption that because a writing has been worked out which is final on some matter it is to be taken as including all the matters agreed upon;

(b) The premise that the language used has the meaning attributable to such language by rules of construction existing in the law rather than the meaning which arises out of the commercial context in which it was used; and

(c) The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous.

2. Paragraph (a) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.

3. Under paragraph (b) consistent additional terms, not reduced to writing, may be proved unless the court finds the writing was intended by both parties as a complete and exclusive statement of all the terms. If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact.

Iowa Code Ann. § 554.2202 cmts. 1–3.

was "expressly limited to 'handcrafted' contracts between parties of equal bargaining strength." *Wolfe v. Graether*, 389 N.W.2d 643, 654 (Iowa 1986). Because the case presently before the Court involves a pre-printed integration clause, *Montgomery* is not directly on point. Moreover, the fact that there are *three* separate integration clauses on each of the writings, #146, #148, and #149, each of which recites, "[t]his agreement contains the entire agreement between Buyer and Seller ..." belies the conclusion that any one of the writings *alone* is the *entire* agreement between the parties. It is, therefore, concluded that the writings #146, #148 and #149 are merely final as to the terms each writing contains.

■ Accordingly, the terms contained in writings #146, #148 and #149 may not be contradicted by any prior or contemporaneous agreement, but may be supplemented or explained by consistent additional terms. *See* Iowa Code Ann. § 554.2202. In this case, the Acceptable Performance Letter, which guarantees production rates for the systems contained in writing #146, #148, and #149, would contradict the partially integrated agreements which exclude all warranties not contained in the writings. *See* J. White & R. Summers, *Uniform Commercial Code*, § 12–4 at 568 n. 2 (3d ed. 1988) [hereinafter White & Summers] ("If ... the writing that includes a disclaimer is intended to be final, most courts hold that parol warranties are "contradictory" within 2–202 and hence inadmissible."). Therefore, the Court finds the parol evidence rule prohibits evidence of the Acceptable Performance Letter to establish the letter was part of the original contract between the two parties.

The next question the Court must address is whether the parties modified their agreement to include the Acceptable Per-

formance Letter. The Iowa UCC section on modification, rescission and waiver, provides:

1. An agreement modifying a contract within this Article needs no consideration to be binding.

2. A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

3. The requirements of the statute of frauds section of this Article (Section 554.2201) must be satisfied if the contract as modified is within its provisions.

4. Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.

5. A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

Iowa Code Ann. § 554.2209 (West 1991).[13] "The drafters of the UCC, through this section, changed the common law by (1) making modifications enforceable even if there was no consideration given and, pertinently for this action, (2) deeming enforceable written agreements that contracts could not be modified by the parties unless the modifications were reduced to signed writings." *Green Constr. Co. v. First Indem. of American Ins.*, 735 F.Supp. 1254, 1260 (D.N.J.1990) (citing *Wisconsin Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1286 (7th Cir.1986) (Posner, J.); and *J.W. Goodliffe & Son v. Odzer*, 283 Pa.Su-

---

**13.** Professor Anderson has explained the differences between modification and waiver:

waiver is the result of the intention of the one party who would otherwise have the right to insist on adherence to contract terms or claim damage for departure therefrom, whereas modification is the result of the bilateral action of both parties to the sales transaction.

Waiver is the surrender of a right to object, or protest, or claim damages, by the person having the right to do so. Modification is the changing of the terms of the agreement which may diminish or increase the duty of either party as distinguished from the mere surrender of a right by one person against another. 2 *Anderson*, § 2–209:7, at 319.

per. 148, 423 A.2d 1032 (Ct.1980)), *aff'd* 935 F.2d 1281 (3d Cir.1991).

Plaintiff has urged the parties modified the terms of their agreement, but has conceded there was no writing signed by both parties. This being the case, I conclude that as a matter of law there could not be a valid modification because the contracts specifically provided, "[c]hanges made in any of the specifications shall be valid only if in writing signed by authorized representatives of the Buyer *and* Seller." (Dkt. 29 at A–21) (emphasis added). *See generally,* Comment 3 to Iowa Code Ann. § 554.2209 ("Subsection (2) permits the parties in effect to make their own Statute of Frauds as regards any future modification of the contract by giving effect to a clause in a signed agreement which expressly requires any modification to be by signed writing.").

This determination does not, however, end the inquiry. The Iowa Code makes clear that while an attempt at modification may not satisfy subsections 554.2209(2) & (3), it can still operate as a waiver. *See* Iowa Code Ann. § 554.2209(4); *see also Double–E Sportswear Corp. v. Girard Trust Bank,* 488 F.2d 292, 295–97 (3d Cir. 1973) (Pennsylvania law). The Comments to the Iowa Code explain, "Subsection (4) is intended, despite the provisions of subsections (2) and (3), to prevent contractual provisions excluding modification except by a signed writing from limiting in other respects the legal effect of the parties' actual later conduct." Iowa Code Ann. § 554.2209 cmt. 4. For an attempted modification to act as a waiver, "[s]uch waiver must be demonstrated by more that mere parol evidence; course-of-performance/conduct evidence indicating a waiver is necessary." *Green,* 735 F.Supp. at 1262. 2 William D. Hawkland, *Uniform Commercial Code Series,* § 2–209:05 at 138 (1982).[14] Indeed, plaintiffs point to a series of letters exchanged between MCP and Hydrotile and conduct by the defendants after documents #146, #148, and #149 were signed which indicate defendants intended the Acceptable Performance Letter to be part of the parties' agreement.

On April 23, 1990, MCP's general manager, Dennis Hinch, wrote to Hydrotile's president, Mike Knight: "All we are asking is for our equipment to operate as was promised by Darryl Haar at the time of the initial sale." (Dkt. 32 at B–29). Having received no response to the April 23, 1990, letter, one of MCP's current shareholders, Joseph Corrado, wrote Landegger, the chairman of Black Clawson, on April 30, 1990: "It is our feeling that we do not have the commitment of the entire Hydrotile organization in getting our machine and system to the level of operation promised when Hydrotile sold us the equipment." (Dkt. 32 at B–30). On May 8, 1990, Landegger responded to the April 30, 1990, letter:

> Black Clawson stands one hundred percent behind the machinery it supplies.
>
> I have spoken to the Division and they will certainly continue their efforts to help you have your machinery operating as soon as possible. However, we also require our customers to pay for the machinery and services we provide according to the terms of our Sales Contracts.... Assuming the financial matters are resolved, I assure you that Black Clawson and Hydrotile will be committed to resolving the issues outlined in your letter.

(Dkt. 32 at B–32). On June 1, 1990, Hydrotile's National Sales Manager, Ron Schriever, wrote to MCP's sales manager, Don Bailey. The letter outlined the issues discussed at an earlier meeting and the conclusions reached. Near the end of the letter, Schriever wrote: "The remainder will be cleaned up after the Hydrotile supplied equipment is operating as sold." (Dkt. 32 at B–35). On June 29, 1990, Corrado again wrote to Landegger:

> On May 23, 1990, terms were agreed to between Hydrotile and Middletown Concrete Products at which time a substantial payment was made to Hydrotile.

---

**14.** Professor Anderson has pointed out that "[i]n spite of the absence of formal requirements for waiver or modification, it is still necessary that there be a manifestation of an intent to depart from the terms of the original contract." *Anderson,* § 2–209:19, at 324 (footnote omitted).

Middletown Concrete Products has kept its part of the bargain. In a letter written on August 29, 1988, Darryl Haar stated that the Neptune Machine would be able to produce the certain number of joints for each size pipe. As of today, three months after start up, Middletown Concrete Products has only realized a production rate ⅓ of what was represented to us.

(Dkt. 32 at B–36). Hydrotile never responded to the June 29, 1990, letter. On July 17, 1990, after visiting MCP, Hydrotile's engineer and technical director of services, Fee, wrote to Hinch: "Hydrotile and Middletown agree that current pipe production does not meet acceptable levels for pipe quantity or quality." (Dkt. 26 at A–14).

Not only were letters exchanged but, among other things, the defendants initiated a "school" in August of 1990 (Dkt. 39 at 60) for Middletown people to help them run the machine better and engaged in efforts to get the machine to produce an increased amount of pipe per hour. When asked at oral argument about these efforts, counsel for defendants denied his clients' efforts were indicative of their original intent in entering into the contracts or their later intent to modify them; rather, counsel urged because Hydrotile is "a responsible supplier ... [t]hey went beyond their strict legal obligations, for many, many months." (Dkt. 39 at 16–17). In other words, counsel urged his clients' efforts were undertaken based on some sort of moral obligation or customer-relations decision rather than out of any legal obligation to increase the production rate of the machine.[15]

▮ Although this case presents a close call, the Court concludes plaintiff has put forth enough evidence to survive summary judgment. The series of letters combined with conduct on behalf of Hydrotile could allow a jury to reasonably infer the parties attempted a modification which operated as a waiver under Iowa Code section 554.-2209(4). Accordingly, summary judgment for defendants will be denied.

## IV.

In its summary judgment motion, plaintiff urges defendant breached its express warranty. The Selling Conditions on the reverse side of all Hydrotile's quotations state, in part:

1. Hydrotile Machinery Company ("Seller") warrants that the equipment manufactured by it shall be free from defects in material and workmanship under normal use and service for a period of 90 days from delivery. Parts claimed and proved to Seller's satisfaction to be defective, shall be replaced or repaired without charge, FOB Nashua, Iowa, provided that immediate notification in writing is given to the Seller. Equipment manufactured by others than the Seller is sold exclusively under such warranty as the manufacturer may give to the Seller and to the extent enforceable by the Seller. THE FOREGOING WARRANTY IS EXCLUSIVE AND IS IN LIEU OF ALL OTHER WARRANTIES (WHETHER WRITTEN, ORAL OR IMPLIED) INCLUDING THE WARRANTY OF MERCHANTABILITY IN OTHER RESPECTS THAN EXPRESSLY SET FORTH ABOVE AND WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. Liability of Seller under this warranty is limited to the repair or replacement of the defective part, all damage claims of whatever nature, including without limitation buyer's labor costs, being excluded.

. . . .

Correction by Seller of non-conformities, whether patent or latent, in the manner and for the period of time provid-

---

**15.** In its reply brief Hydrotile noted that on July 18, 1990, representatives of both parties met. "[T]he contemporaneous notes and the deposition testimony of Dennis Hinch, MCP's former plant manager, confirm that the parties disagreed [at the July 18, 1990, meeting] on what production rates would constitute acceptable performance of the Neptune." (Dkt. 34 at 8–9 (citing Dkt. 35 at DRA 3, 8–12)). While this evidence may certainly be weighed by a jury, it does not change the Court's conclusion that plaintiff has put forth enough evidence to survive summary judgment.

ed above, shall constitute fulfillment of all liabilities of Seller for such non-conformation, whether based on contract, warranty, negligence, indemnity, strict liability or otherwise, with respect to or arising out of the sale or use of such equipment.

(Dkt. 26 at A–1). The Selling conditions further provide:

2. Seller is not responsible for claims of any kind based upon downtime, overhead, labor expense, loss of use of, or damage to, machinery, equipment or structures, spoilage and loss of production or profit. In addition, the Seller is not responsible for consequential or incidental damages for any cause arising out of or in connection with this agreement.

The remedies of the Buyer set forth herein are exclusive and the total liability of Seller with respect to the performance or breach of this agreement in connection with the manufacture, sale, delivery, installation or repair of the equipment purchased hereunder, or the technical direction covered or furnished under this agreement, whether based on contract, warranty, negligence, indemnity, strict liability or otherwise is limited to Seller's obligation to repair or replace defective parts as provided and within the time period set forth in Section 1 hereof.

*Id.*

■ Based on the above quoted language MCP apparently argues defendants warranted they would repair or replace any and all "defects" within 90 days of delivery regardless of when MCP notified Hydrotile of the defects. Contrary to MCP's position, the Court reads the above quoted language to mean that Hydrotile would repair or replace defective parts *identified* within 90 days and meeting the other conditions of the warranty. Were the Court to read the language as MCP urges, if MCP properly

notified Hydrotile of a defective part on the 89th day, Hydrotile would be in breach if that item were not repaired or replaced by the 90th day. Such a result would be both unexpected and unreasonable. *See Bamdad Mechanic Co. v. United Technologies Corp.*, 586 F.Supp. 551, 555 (D.Del.1984) (citing *Holland v. National Automotive Fibers*, 194 A. 124 (Del.Ch.1937), and stating "contracts should be given a reasonable and fair construction rather than one that leads to an unreasonable result."), *vacated without op.*, 760 F.2d 255 (3d Cir.1985).

■ Plaintiff makes the alternative additional argument that because defendants never repaired or replaced certain defective parts the limitation of remedies failed of its essential purpose.[16] The Iowa Code section on failure of essential purpose is nearly identical to § 2–719 of the Uniform Commercial Code and reads as follows:

1. Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

a. the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

b. resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

2. Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Chapter.

3. Consequential damages may be limited or excluded unless the limitation

---

**16.** In this case, the parties dispute the substance of the bargain. Defendants maintain they contracted to provide merely an "operational" system. Because the system is producing 34 pipes per hour, defendants argue plaintiff has received the substantial value of its bargain. Plaintiff, on the other hand, maintains it bargained for a system that would produce 56 pipes per hour and has received a system that pro-

duces substantially less. Recognizing the dispute as to what constitutes the substance of the bargain, plaintiff has limited its argument on summary judgment to the following: 1) defendants promised to repair and replace defective parts; 2) defendants were timely notified of defective parts; 3) defendants never repaired or replaced defective parts; 4) therefore, the remedy failed of its essential purpose.

or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima-facie unconscionable but limitation of damages where the loss is commercial is not.

Iowa Code Ann. § 554.2719.

The Court's analysis begins with the applicable remedy in order to determine its essential purpose and whether it has failed of that purpose. In this case, the Contracts provided the limited remedy of repair and replace. The Court of Appeals for the Third Circuit has noted this limited remedy's

> primary objective is to give the seller an opportunity to make the goods conform while limiting exposure to risk by excluding liability for damages that might otherwise be due. *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del.1973). Viewed from the buyer's standpoint, the repair remedy's aim is to provide goods that conform to the contract for sale and do so at an appropriate time.

*Chatlos Systems v. National Cash Register Corp.*, 635 F.2d 1081, 1085 (3d Cir.1980) (citation omitted).

The Code defines what constitutes failure of purpose in the Official Comments to § 2–719: "[W]here an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." Iowa Code Ann. § 554.2719 cmt. 1. The Court of Appeals for the Fifth Circuit has stated, "[t]he test in determining whether a limited remedy failed of its essential purpose is whether the buyer is given, within a reasonable time, goods that conform to the contract." *Delhomme Industries, Inc. v. Houston Beechcraft Inc.*, 669 F.2d 1049,

1063 (5th Cir.1982) (citing *Beal v. General Motors Corp.*, 354 F.Supp. 423, 426 (D.Del. 1973), and others).

Although plaintiff delineated some of what was in need of repair or replacement, plaintiff did not delineate what had or had not been repaired or replaced. When asked at oral argument which parts had not been repaired or replaced, plaintiff was able to identify only one item: air couplings on the forms. (Dkt. 39 at 85). Beyond this one item, plaintiff did not, however, outline anywhere in its briefs or appendixes exactly which parts were not repaired or replaced. Defendants, on the other hand, maintain that at most one part may not have been repaired or replaced. (Dkt. 39 at 105). According to defendants, the reason this one part may not have been repaired was because plaintiff filed suit. Whether defendants were required to repair or replace the air couplings prior to plaintiff's filing suit is a question best left to the jury. Because the Court lacks factual guidance as to remaining parts complained of by plaintiff, the Court will deny plaintiff's motion for summary judgment. Simply stated, the Court lacks the factual predicate to rule on whether there was a failure of essential purpose.

Should a jury find there has been a failure of essential purpose, both plaintiff and defendants agree that plaintiff is entitled to damages under section 554.2714 of Iowa's Uniform Commercial Code.[17] Plaintiff makes the additional argument that it is entitled to recover incidental and consequential damages attributable to defendants' breach of warranty.[18] Counsel have cited no Iowa Supreme Court cases addressing this issue and independent research by the Court has revealed no such cases. Accordingly, this Court must pre-

**17.** Section 2–714 of Iowa's Uniform Commercial Code provides in part:
1. Where the buyer has accepted goods and given notification (subsection (3) of Section 554.2607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

Iowa Code § 554.2714(1).

**18.** At oral argument, plaintiff noted its argument on this point was probably more akin to a motion in limine. In the interests of judicial economy, however, the Court will rule on it now.

dict how the highest Court in Iowa would rule.[19]

The Courts from various jurisdictions are divided on the issue of whether a clause disclaiming liability for consequential damages is automatically ineffective when a repair and replacement remedy has failed of its essential purpose. Some courts have read subsection (2) and (3) of § 2-719 as being interdependent, thus permitting recovery of consequential and incidental damages when a limitation of remedy contained in a contract has failed of its essential purpose. *See eg. Ragen Corp. v. Kearney & Trecker Corp.*, 912 F.2d 619 (3d Cir.1990) (applying Wisconsin law); *R.W. Murray, Co. v. Shatterproof Glass Corp.*, 758 F.2d 266 (8th Cir.1985) (applying Missouri law); *Matco Mach. & Tool Co. v. Cincinnati Milacron Co.*, 727 F.2d 777 (8th Cir.1984) (applying Ohio law); *Soo Line R.R. Co. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir. 1977) (applying Minnesota law); *see* Special Project, *Article Two Warranties in Commercial Transactions: An Update*, 72 Cornell L.Rev. 1159, 1307 (1987) (noting a majority of cases have concluded that the failure of an exclusive remedy voids the consequential damages exclusion when an exclusive remedy fails).

These "interdependent" courts find support for their position in the straightforward application of § 2-719(2) which reads, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, the remedy may be had as provided in this chapter." Focusing solely on the language of subsection (2), the interdependent courts conclude that when a limited remedy fails of its essential purpose, the plain language of subsection (2) entitles plaintiff to consequential and incidental damages as remedies available "in this chapter."

Further support for this position is found in the comments to § 2-719. Comment 1

to Iowa's equivalent of § 2-719, for instance, reads in pertinent part, "[U]nder subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." Since consequential and incidental damages are permitted under the general remedy provisions of the Iowa Code, it can be argued they are, therefore, permitted when the limited remedy of repair and replace fails of its essential purpose. Explaining the underlying assumptions of this approach, one student commentator has observed, interdependent courts "conclude that the parties intended the validity of the consequential damage exclusion to depend on the effectiveness of the limited remedy; if the limited remedy fails, so does the consequential damage exclusion." Kathryn I. Murtagh, Note, *UCC Section 2-719: Limited Remedies and Consequential Damage Exclusions*, 74 Cornell L.Rev. 359, 369 (1989).

Other courts, however, have reached different conclusions based on the language in subsection (3). *See eg. Chatlos Systems v. National Cash Register Corp.*, 635 F.2d 1081 (3d Cir.1980) (interpreting New Jersey Law); *AES Technology Systems, Inc. v. Coherent Radiation*, 583 F.2d 933 (7th Cir. 1978) (interpreting Illinois law); *American Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 457-58 (S.D.N.Y. 1976). Subsection (3) reads, "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima-facie unconscionable but limitation of damages where the loss is commercial is not." The courts relying on subsection (3) view it as "independent" from subsection (2). Ac-

---

**19.** The Court of Appeals for the Third Circuit has noted:

In order to make an accurate prediction of this kind, a federal court should examine all relevant sources of the pertinent state law including related decisions of the highest state court, decisions of the intermediate appellate

courts, decisions of lower courts, scholarly treatises, Restatements of Laws and germane law review articles.

*Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.*, 626 F.2d 280, 285 (3d Cir.1980) (footnote omitted).

cordingly, these "independent" courts "see no reason to hold, as a general proposition, that the failure of the limited remedy provided in the contract, without more, invalidates a wholly distinct term in the agreement excluding consequential damages. The two are not mutually exclusive." *Chatlos*, 635 F.2d at 1086. That the two subsections are independent is supported by the Code which tests each by a different standard: a limited remedy of repair or replace survives under subsection (2) unless it fails of its essential purpose; a limitation of consequential damages survives under subsection (3) unless it is unconscionable. Because the tests for the two subsections are different, the "independent" courts conclude the two subsections are wholly distinct.

Further support for this approach can also be found in the comments to § 2–719. Comment 1 to the Iowa equivalent of § 2–719 reads, "Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect." Iowa Code Ann. § 554.2719 cmt. 1. Consistent with this sentiment, independent courts have concluded the purpose of § 2–719 is to encourage and facilitate allocation of risk between contracting parties. *See AES Technology*, 583 F.2d at 941. Accordingly, independent courts will not preclude a limitation of consequential damages unless it is unconscionable. *See generally* Jonathan A. Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2–719(2)* 65 Cal.L.Rev. 28 (1977) [hereinafter "Eddy Article"].

■ Having weighed both positions, the Court concludes the latter line of cases is more thoroughly reasoned and consistent with the general purposes of the Uniform Commercial Code. *See Chatlos*, 635 F.2d at 1086. According to Professors James White and Robert Summers, the cases treating the two subsections as independent,

> seem most true to the Code's general notion that the parties should be free to contract as they please. When the state intervenes to allocate the risk of consequential loss, we think it more likely that the loss will fall on the party who cannot avoid it at the lowest cost. This is particularly true when a knowledgeable buyer is using an expensive machine in a business setting. It is the buyer who operates the machine, adjusts it, and understands the consequences of its failure. Sometimes flaws in such machines are inherent and attributable to the seller's faulty design or manufacture. But the fault may also lie in buyer neglect, inadequate training and supervision of the operators or in intentional use in ways forbidden by the seller. Believing the parties to know their own interests best, we would leave the risk allocation to the parties.

White & Summers § 12–10 at 605. Although Iowa courts have never addressed this precise issue, the Iowa Supreme Court consistently cites White & Summers for basic principles under the UCC. *See eg. Allison–Kesley AG Center Inc. v. Hildebrand*, 485 N.W.2d 841, 844 (Iowa 1992); *Husker News Co. v. South Ottumwa Savings Bank*, 482 N.W.2d 404, 408 (Iowa 1992); *General Electric Capital Corp. v. Vashi*, 480 N.W.2d 880, 882 (Iowa 1992). Finally, the conclusion reached by this Court is consistent with what appears to be the current trend. *See eg. Riegel Power Corp. v. Voith Hydro*, 888 F.2d 1043, 1047 (4th Cir.1989) (noting more recent cases favor considering the two subsections as independent); *McKernan v. United Technologies Corp.*, 717 F.Supp. 60, 70 (D.Conn. 1989) (noting current trend is to uphold damage limitations even when the available remedy fails of its essential purpose); *but see* Henry Mather, *Consequential Damages When Exclusive Repair Remedies Fail: Uniform Commercial Code Section 2–719*, 38 S.C.L.Rev. 673, 691 (1987) (urging courts to adopt the following presumption: "In the absence of an explicit or clear indication to the contrary, it should be presumed that the buyer agreed to exclude consequential damages only on the condition that defects are corrected by repair or

replacement within a reasonable time.").[20]

■■■ While consequential damages are generally permissible under the Iowa Code, *see* § 554.2714, in this case the parties to the contract allocated the risks to preclude recovery of consequential damages. Just as consequential damages are permissible under the Code, so too are they subject to limitation. Accordingly, plaintiff cannot recover consequential or incidental damages unless the limitation is unconscionable. *See* Iowa Code Ann. § 554.2719(3).[21] On these facts, however, the limitation is not unreasonable.

## V.

■■■ Plaintiff alleges defendants made two false representations: 1) Haar falsely represented that the Neptune machine would produce pipes at certain rates; (Dkt. 31 at 30); and 2) Haar also represented that the criteria of the Acceptable Performance Letter were part of the contracts which MCP executed. Defendants argue that MCP's misrepresentation claims fail because MCP cannot satisfy the elements of this cause of action. The parties agree that Delaware law applies to plaintiff's false representation claims.

To establish a claim of fraud in Delaware, a plaintiff must prove:

1) a false representation, usually of fact, made by the defendant;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance.

*Stephenson v. Capano Development, Inc.,* 462 A.2d 1069, 1074 (Del.1983).

Defendants argue plaintiff has not shown that Haar made the production estimates in the Acceptable Performance Letter with falsity or reckless indifference. In support of their position, defendants note that although it is undisputed that the Neptune had never been in operation before Mr. Haar wrote the Acceptable Performance Letter, Haar prepared the estimates based on discussions with Hydrotile engineers and on the performance of prior generations of Hydrotile machinery. (Dkt. 32

20. Plaintiff cites *Select Pork, Inc. v. Babcock Swine, Inc.,* 640 F.2d 147 (8th Cir.1981), for the proposition that under Iowa law, when a limited remedy fails of its essential purpose, a plaintiff is entitled to recover all damages provided by the UCC including incidental and consequential damages. (Dkt. 25 at 24). *Select Pork* involved the sale of 575 highly touted "Midwestern Gilt" pigs. *Id.* at 148. As part of its national advertising campaign, defendant prepared a brochure entitled "Meet the Midwestern Gilt." *Id.* The brochure made certain representations describing the gilt. Plaintiff entered into a contract with defendant for the sale of the gilts. The sales contract contained a disclaimer of warranties and a limitation of remedies provision. *Id.* At the time of contracting, however, defendant knew it did not have a sufficient number of gilts to sell to plaintiff. *Id.* At the time set for delivery, defendant substituted pigs bought from a commercial dirt lot in Kansas. *Id.* Plaintiff ran into problems with the pigs and, upon discovering that the pigs were not Midwestern Gilts, filed suit.

The Court of Appeals affirmed the district court's conclusion that the limitation of remedies failed of its essential purpose because defendant did not deliver the Midwestern Gilts.

*Id.* at 149. The Court of Appeals also affirmed the district court's conclusion that the limitation on recovery of consequential damages was unconscionable because defendant knew at the time of the writing of the contract that there was a chance it would not be able to produce enough pigs to meet the contract. *Id.* In so affirming the Court of Appeals noted, "Had ... [defendant] delivered the promised Midwestern Gilts and Midwestern Boars, then the claim limiting damages to return of the purchase price would have been reasonable." *Id.*

To the extent that *Select Pork* supports the conclusion that plaintiff is entitled to recover consequential damages in this case, this Court respectfully disagrees. Although *Select Pork* was interpreting Iowa law, it cited no Iowa cases on this point and instead relied on the same Iowa Code provisions cited in the text of this opinion.

21. Plaintiff makes the final argument that the limitation of remedies provision are unenforceable. (Dkt. 25 at 32). This case, however, involves a commercial transaction between parties with commensurate bargaining strengths. Accordingly the Court finds little merit in plaintiff's contention and will not disturb the limitation of remedies agreed to by the parties.

at B–116–121). Additionally, defendants point out that at the time the Acceptable Performance Letter was written, MCP knew that no Neptune was in operation. Plaintiff, however, argues that in March, 1989, when Haar reaffirmed his representation regarding production rates, he knew the production rates he had represented had been theoretically extrapolated from theoretical production rates of a machine that, despite five years of operation, had failed to produce pipe at an acceptable rate. (Dkt. 32 at B–104).[22]

While plaintiff knew the Neptune was a new machine and that the first installation of it was in ACP's plant, defendants' counsel at oral argument related that it was not sure "that Middletown knew the process that Hydrotile went through[ ] in estimating the production capability." (Dkt. 39 at 27). Thus, a jury might reasonably find that Hydrotile's estimates, based on extrapolations from theoretical production rates of a machine that never met those rates, were made with reckless indifference.

## VI.

For the reasons set forth above, both defendants' and plaintiff's respective motions for summary judgment will be denied.

---

**22.** Defendant also argued that any reliance by plaintiff on the alleged misrepresentations would have been unjustifiable "because the written integrated agreements, containing all of the defendant's promises and representations pertaining to the contracts, did not include the representations upon which plaintiff's fraud claims are predicated." (Dkt. 28 at 19 (citing *J.A. Moore Const. Co. v. Sussex Associates,* 688 F.Supp. 982, 990–91 (D.Del.1988), and other cases)). Defendant's argument on this point appears to be centered on the presence of the merger clause. In Delaware, however, the presence of "a merger clause does not preclude a claim based upon fraudulent misrepresentations." *Norton v. Poplos,* 443 A.2d 1, 6 (Del. 1982).