RHEEM MANUFACTURING COMPANY, Appellant (Defendant below),

v.

PHELPS HEATING & AIR CONDITIONING, INC., Appellee (Plaintiff below).

No. 49S02–0003–CV–219.

Supreme Court of Indiana.

May 9, 2001.

Stephen L. Vaughan, Thomas J. Campbell, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, Attorneys for Appellant.

Robert A. Garelick, Bryan S. Redding, Cohen, Garelick & Glazier, Indianapolis, IN, Attorneys for Appellee.

**ON PETITION TO TRANSFER**

SULLIVAN, Justice.

Phelps expended considerable sums repairing Rheem furnaces that Phelps had sold and installed. We hold that the language of the UCC precludes Phelps from recovering consequential damages from Rheem for breach of express warranty and that the language of the express warranty at issue precludes Phelps from recovering for labor expenses. However, Phelps may still have valid claims for indemnity and breach of implied warranty.

*Background*

We will briefly explain the background of this case; for a complete discussion, see the Court of Appeals opinion in *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 714 N.E.2d 1218 (Ind.Ct. App.1999).

Rheem Manufacturing Company ("Rheem") makes furnaces for use in homes and offices. During the late 1980s and early 1990s, Rheem sold its furnaces through a distributor, Federated Supply Corporation ("Federated"). Federated in turn sold Rheem furnaces to Phelps Heating and Cooling ("Phelps"), a central Indiana contractor.

The box in which every furnace was shipped contained the following warranty:

> Manufacturer, RHEEM AIR CONDITIONING DIVISION, warrants ANY PART of this furnace against failure under normal use and service within the applicable periods specified below, in accordance with the terms of this warranty.

(R. at 105.) This express warranty was limited by three clauses that are at the heart of this appeal. First, Rheem limited the remedies available for breach of the warranty to replacement of parts:

> Under this Warranty, RHEEM will furnish a replacement part that will be warranted for only the unexpired portion of the original warranty....

(*Id.*)[1] Second, Rheem disclaimed consequential and incidental damages:

> ANY CLAIMS FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES ARE EXPRESSLY EXCLUDED.

(*Id.*) Finally, Rheem disclaimed any liability for the cost of servicing the furnaces:

> This Warranty does not cover any labor expenses for service, nor for removing or reinstalling parts. All such expenses are your responsibility unless a service labor agreement exists between you and your contractor.

(*Id.*)

During the early 1990s, several types of Rheem furnaces malfunctioned after Phelps installed them. A Phelps executive testified that from "late 1989 until 1993, Rheem had virtually no high efficiency furnaces on the market that were not experiencing reliability problems ...." (R. at 326.) While Rheem issued numerous "technical service bulletins" offering in-

---

1. On its face, it is unclear if this remedy is *exclusive*, but this ambiguity is clarified by a subsequent term: "RHEEM'S SOLE LIABIL- ITY WITH RESPECT TO DEFECTIVE PARTS SHALL BE AS SET FORTH IN THIS WARRANTY ...." (*Id.*)

structions on how to fix these problems, Phelps customers experienced difficulties for another three to four years.

Phelps executives met with a Rheem service representative on May 11, 1994. At this meeting, Phelps requested between $40,000 and $65,000 to compensate it for the cost involved in servicing the furnaces. Rheem rejected this request.

Phelps brought suit against Rheem and Federated on August 8, 1994, claiming that Rheem breached its express and implied warranties and was negligent in its manufacture of the furnaces. Underlying all of these claims is Phelps's assertion that the furnaces "shut down and were not operational after installation. Among other things, the pilot assemblies, hot surface ignitors, flame sensors and ignition controls failed." (R. at 26.) The complaint first contended that Rheem breached the implied warranty of fitness for a particular purpose because Rheem and Federated "knew that Phelps intended to use the furnaces and install them in properties serviced by Phelps" (R. at 21) but the furnaces were "defective, and after they had been installed ... they failed to function properly." (*Id.*) Similarly, Phelps sought damages for breach of the implied warranty of merchantability, contending that Rheem and Federated were merchants but that the defects in the furnaces made them "unsuitable and posed a risk of personal injury and property damages to customers serviced by Phelps ...." (R. at 23.) Phelps also asserted a claim under the express warranty, arguing that it "incurred substantial expenses and other damages in remedying the problems caused by the defective furnaces." (R. at 25.) Finally, Phelps claimed that "Rheem and Federated Supply were negligent and careless in their design and sale of the furnaces by failing to manufacture and provide furnaces which were operational and in reasonable working order." (R. at 26.)

Phelps described its damages as including "but not limited to, lost customers, lost profits, and the additional cost of servicing the defective furnaces and remedying the defects therein." (R. at 22.) In answers to interrogatories, Phelps listed its warranty damages as "lost service charges," "lost labor charges," "lost profits" from two customers who would no longer do business with Phelps; and the "approximate value of office time spent ... comput[ing] damages." (R. at 225.)

Rheem moved for summary judgment on all of these claims. Rheem's brief in support of its motion asserted that the damages Phelps sought on the warranty theories were precluded by the limitations in the express warranty and by lack of privity on the implied warranties. Rheem also argued that Phelps could not claim tort damages for the purely economic injuries that resulted from the failure of the furnaces to operate as intended. The trial court granted Rheem's motion for summary judgment in regards to negligence, but denied it as to the warranties.

Rheem sought an interlocutory appeal on the warranty claims and the trial court certified its order. The Court of Appeals affirmed the denial of summary judgment. *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 714 N.E.2d 1218 (Ind. Ct.App.1999). As for the express warranties, the Court of Appeals found a genuine issue of material fact as to "whether the cumulative effect of Rheem's actions was commercially *reasonable.*" *Id.* at 1228 (emphasis in original). On the implied warranty claims, the court stated that the evidence establishing privity was "slight." The court nevertheless held that "perfect vertical privity is not necessary in this case" and then found a genuine issue of material fact as to whether Rheem breach-

ed its implied warranties and whether its conduct in doing so was "reasonable." *Id.* at 1231.

### Discussion

■ When reviewing an entry of summary judgment, we stand in the shoes of the trial court. Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Ind. Trial Rule 56(C). We do not reweigh the evidence, but will consider the facts in the light most favorable to the nonmoving party. *See City of Gary v. Indiana Bell Telephone Co.*, 732 N.E.2d 149, 153 (Ind.2000).

Rheem's appeal raises three issues which require us to analyze the operation of express and implied warranties under Indiana's version of the Uniform Commercial Code ("the UCC").

### I

■ Rheem first argues that the trial court should have granted summary judgment as to Phelps's claim for lost profits under the express warranty because the warranty excluded consequential damages.[2] This argument requires us to examine the interplay between Indiana Code §§ 26–1–2–719(2) and (3), the UCC subsections pertinent to damage exclusions and remedy limitations in express warranties:

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in IC 26–1.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable, but limitation of damages where the loss is commercial is not.[3]

Rheem and Phelps present conflicting constructions of these subsections. Both parties appear to accept that the remedy provided by Rheem failed of its essential purpose and that Phelps is entitled to the benefits of the express warranty.[4] But Phelps contends that, under § 2–719(2), where a limited remedy "fail[s] of its essential purpose, remedy may be had as provided in IC 26–1," which includes con-

---

**2.** While Phelps seeks both consequential and incidental damages, the same analysis applies to each and we will discuss only consequential damages.

**3.** The first section of the same statute expressly allows such limitations and exclusions:

(1) Subject to the provisions of subsections (2) and (3) and of IC 26–1–2–718 on liquidation and limitation of damages:

 (a) the agreement may provide for remedies in addition to or in substitution for those provided in IC 26–1–2 and may limit or alter the measure of damages recoverable under IC 26–1–2, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

 (b) resort to a remedy as provided is optional unless the remedy is expressly

agreed to be exclusive, in which case it is the sole remedy.

Ind.Code § 26–1–2–719(1) (1993).

**4.** The trial court did not certify the question of whether the remedy actually failed of its essential purpose and Rheem concedes that this issue "is not in debate." Appellant's Reply Br. at 11. *See also Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 714 N.E.2d 1218, 1223 (Ind.Ct.App.1999) ("Rheem's argument seems to be that the failure of essential purpose *vel non* is irrelevant."). We express no opinion as to this issue here. *See generally Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1085–88 (Ind.1993) *Hahn v. Ford Motor Co., Inc.*, 434 N.E.2d 943, 948 (Ind.Ct.App.1982). Similarly, both parties appear to assume that the warranty and its remedy limitations are applicable and we also express no opinion on this issue.

sequential damages. Phelps argues that because Rheem's repair attempts failed for roughly four years, the limited remedy of replacement of parts failed of its essential purpose and Phelps could claim all buyer's remedies provided by the UCC, including consequential damages. Rheem counters that its exclusion of consequential damages is controlled by § 2–719(3). Rheem argues that despite the failure of the limited remedy under § 2–719(2), § 2–719(3) allows an exclusion of consequential damages to operate unless it is unconscionable.[5]

■ These arguments pose the question of whether an exclusion of consequential damages survives when a separate contract provision limiting a buyer's remedies has failed of its essential purpose. The courts that have faced this issue have fallen into two camps that are divided along the lines of the parties' arguments in this case. One group takes what is known as the "dependent" view and reads § 2–719(2)'s reference to remedies "provided in [the UCC]" as overriding a contract's consequential damage exclusion. *See, e.g. Middletown Concrete Prod. v. Black Clawson Co.*, 802 F.Supp. 1135, 1151 (D.Del. 1992) (collecting cases). This gloss on § 2–719 makes an exclusion of consequential damages dependent on whether a limited remedy fails of its essential purpose. *See Adams v. J.I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1, 8 (1970). Other courts take an "independent" view and reason that because §§ 2–719(2) and (3) are separate subsections with separate language and separate standards, the failure of a limited remedy has no effect on an exclusion of consequential damages. *See Waters v. Massey–Ferguson, Inc.*, 775 F.2d

587, 592–93 (4th Cir.1985) (collecting cases).

The Court of Appeals accepted the independent view. However, the court also grafted onto § 2–719 a requirement of "commercial reasonableness" and affirmed the denial of summary judgment on the ground that a triable issue existed as to whether Rheem's consequential damages exclusion and limited remedy were commercially reasonable.

■ We hold that Indiana Code § 26–1–2–719(2) does not categorically invalidate an exclusion of consequential damages when a limited remedy fails of its essential purpose. *See Schurtz v. BMW of North America, Inc.*, 814 P.2d 1108, 1112 (Utah 1991) (using tools of statutory interpretation in applying independent view). Our first step in interpreting any Indiana statute is to determine whether the legislature has spoken clearly and unambiguously on the point in question. *See Poehlman v. Feferman*, 717 N.E.2d 578, 581 (Ind.1999) ("When a statute is clear and unambiguous, we need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. Clear and unambiguous statutory meaning leaves no room for judicial construction."), *reh'g denied*; *Benham v. State*, 637 N.E.2d 133, 136–37 (Ind.1994) ("When a statute is clear and unambiguous, there is no need to apply any rules of construction other than that requiring words and phrases to be taken in their plain, ordinary, and usual sense."). A statute is ambiguous when "it is susceptible to more than one interpretation." *In re Lehman*, 690 N.E.2d 696, 702 (Ind. 1997). *See also Amoco Production Co. v. Laird*, 622 N.E.2d 912 (Ind.1993).

5. Phelps does not argue that the clause at issue was unconscionable. *See, e.g.*, Appellee's Br. at 25–28.

In light of the depth of disagreement among the courts that have faced this issue, it is evident that the UCC is ambiguous on this point. *See Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784, 800 (1978) ("The UCC is ambiguous with respect to the effect that a failure of a limited remedy under [§ 2–719(2)] has on other contractual provisions."). The UCC subsections at issue are susceptible to two interpretations—one dependent, one independent—and as such we have no plain language to apply.

 Faced with an ambiguous statute, we turn next to other applicable canons of construction. First, we note that "[o]ur main objective in statutory construction is to determine, effect and implement the intent of the legislature." *Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 989 (Ind.1998). *See also Seifert v. Bland*, 587 N.E.2d 1317, 1319 (Ind. 1992), *reh'g denied*. In ascertaining this intent, we "presume that the legislature did not enact a useless provision" such that "[w]here statutory provisions are in conflict, no part of a statute should be rendered meaningless but should be reconciled with the rest of the statute." *Robinson v. Wroblewski*, 704 N.E.2d 467, 474–75 (Ind.1998). *See also Spaulding v. International Bakers Services, Inc.*, 550 N.E.2d 307, 309 (Ind.1990) ("Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the statute.").

 Several aspects of Indiana Code §§ 26–1–2–719(2) and (3) point to a legislative intent consistent with the independent view. First, as many independent courts have noted, the drafters of the UCC inserted distinct legal standards into each provision. A limited remedy will be struck when it fails of its essential purpose; an exclusion of consequential damages fails when it is unconscionable. Moreover, these subsections are distinct in *who* applies the standards they set out. Whether a limited remedy fails of its essential purpose is an issue of fact that a jury may determine. *See, e.g., Delhomme Indus., Inc. v. Houston Beechcraft, Inc.*, 669 F.2d 1049, 1063 (5th Cir.1982). Conversely, an exclusion of consequential damages stands unless it is unconscionable, and unconscionability is determined by a court as a matter of law. *See* Ind.Code § 26–1–2–302 (1993).[6] These facial distinctions between §§ 2–719(2) and (3) suggest a legislative intent that the provisions should function independently of one another.

 Second, the independent view is consistent with the principle of statutory interpretation that "[w]here possible, we interpret a statute such that every word receives effect and meaning and no part is rendered 'meaningless if it can be reconciled with the rest of the statute.'" *Bagnall v. Town of Beverly Shores*, 726

---

6. The two sections also aim at distinct contractual functions:

> A contract may well contain no limitation on breach of warranty damages but specifically exclude consequential damages. Conversely, it is quite conceivable that some limitation might be placed on a breach of warranty award, but consequential damages would expressly be permitted.
>
> The limited remedy of repair and consequential damages exclusion are two discrete ways of attempting to limit recovery for breach of warranty. The Code, moreover, tests each by a different standard. ... We therefore see no reason to hold, as a general proposition, that the failure of the limited remedy provided in the contract, without more, invalidates a wholly distinct term in the agreement excluding consequential damages. The two are not mutually exclusive.

*Chatlos Systems v. National Cash Register Corp.*, 635 F.2d 1081, 1086 (3rd Cir.1980).

N.E.2d 782, 786 (Ind.2000) (quoting *Spaulding*, 550 N.E.2d at 309). *See also Schurtz v. BMW of North America, Inc.*, 814 P.2d 1108, 1114 (Utah 1991) ("This independent reading of the two provisions also conforms to the general rule that we should construe statutory provisions so as to give full effect to all their terms, where possible."). The dependent view renders § 2–719(3) inoperative by deleting an exclusion of consequential damages without any analysis of its unconscionability. *See id.* ("If we were to read subparts (2) and (3) as dependent, we would effectively read out the unconscionability test of subpart (3) . . . ."). *Cf. Middletown Concrete Prod. v. Black Clawson Co.*, 802 F.Supp. 1135, 1151 (D.Del.1992) (noting that dependent courts award consequential damages by "[f]ocusing solely on the language of subsection (2) . . . ."). On the other hand, the independent view allows both provisions to operate: § 2–719(2) will strike a failed limited remedy, allowing the buyer to claim damages, but not consequential damages if a valid clause excludes them under § 2–719(3). This construction harmonizes the language in § 2–719(2) that "remedy may be had as provided in IC 26–1" with the unconscionability test imposed by § 2–719(3). The "remedy" clause in § 2–719(2), which is crucial to the dependent argument, must be taken in its fullest sense. *See, e.g.*, Ind.Code § 26–1–1–102 cmt. 1 (West 1995). On its face, the phrase refers to all of the UCC, not merely its remedy provisions.[7] Therefore "remedy may be had" under subsection (2) only to the extent that it is not limited by subsection (3), which is part of "IC 26–1." *Cf. Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784, 800 (1978) ("The official comment states that if a remedy fails of its purpose, 'it must give

way to the general remedy provisions of this article' . . . . The remedy provisions of that [article] not only provide for the recovery of consequential damages, but also for their exclusion where not unconscionable.") (citations omitted).

Third, the UCC instructs us to construe its provisions with three specific legislative purposes in mind, all of which comport with the independent view:

(1) IC 26–1 shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of IC 26–1 are:

(a) to *simplify, clarify, and modernize* the law governing commercial transactions;

(b) to permit the continued *expansion of commercial practices* through custom, usage, and agreement of the parties;

(c) to make *uniform* the law among the various jurisdictions.

Ind.Code § 26–1–1–102 (1993) (emphasis added) ("Purposes; rules of construction; variation by agreement"). *See also id.* cmt. 1 ("The Act should be construed in accordance with its underlying purposes and policies. The text of each subsection should be read in the light of the purpose and policy of the rule or principle in question, as also of the Act as a whole . . . ."); *Kearney & Trecker Corp. v. Master Engraving Co.*, 107 N.J. 584, 527 A.2d 429, 432 (1987) (relying on § 1–102 to apply independent view). The independent view serves all of the enumerated purposes. The independent view supplies *simplicity* and *clarity* by allowing a clearly expressed agreement to control a transaction. *See* Ind.Code § 26–1–1–102(2)(a) (1993). The independent view is also the *modern* trend. *See Middletown Concrete*, 802 F.Supp. at

---

**7.** If the drafters of the UCC intended to refer only to buyer's remedies, they would have referred to "IC § 26–1–2–711 *et seq.*" or a similar designation.

1152. The independent view aids sound *commercial practice* by allowing the parties to anticipate clearly the results of their transaction, while the dependent view retains the specter of unknown damages for the seller despite the parties' explicit understanding to the contrary. *See* Ind. Code § 26–1–1–102(2)(b) (1993).[8] The fact that courts are divided on this issue indicates that precise *uniformity* is impossible. *See* Ind.Code § 26–1–1–102(2)(c) (1993). *See, e.g., Chatlos,* 635 F.2d at 1086 (noting that as of 1980 *neither* view carried a majority). However, as we have noted, the modern trend is towards the independent view. *See Riegel Power Corp. v. Voith Hydro,* 888 F.2d 1043, 1047 (4th Cir.1989).

Finally, the legislature's intent to follow the independent view is also supported by the UCC's general policy favoring the parties' freedom of contract. The UCC tells us that one of its paramount concerns is enabling contracting parties to control their own relationships. *See, e.g.,* Ind. Code § 26–1–1–102(3) (1993) ("The effect of provisions of IC 26–1 may be varied by agreement, except as otherwise provided in IC 26–1 ...."); *Id.* cmt. 2 ("Subsection (3) states affirmatively at the outset that freedom of contract is a principle of the [UCC] ...."). Official Comment One to Indiana Code § 26–1–2–719 states that "[u]nder this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect." However, the dependent view ignores the intent of the parties and allows a buyer to recover consequential damages despite an explicit contract term excluding them. The dependent courts essentially *presume* that the parties intended the exclusion of consequential damages to depend on the limited remedy. *See, e.g.,* Kathryn I. Murtagh, Note, *UCC Section 2–719: Limited Remedies and Consequential Damage Exclusions,* 74 Cornell L.Rev. 359, 369 (1989) ("Dependent courts begin by presuming that the parties intended to link the consequential damage exclusion and limited remedy.").[9] On the other hand, the independent view refuses to override categorically an exclusion of consequential damages and will give effect to the terms of the contract. Indeed, consistent with the principle of freedom of contract, the independent view allows the parties to *agree* to a dependent arrangement.

This freedom to set contract terms is especially important in the context of a commercial transaction. Sophisticated commercial actors should be free to allocate risks as they see fit, and courts

---

**8.** Sound commercial practice may require sellers in certain industries to exclude exposure to possibly expansive consequential damages:

> [T]he potential significance of liability for consequential damages in commercial transactions undoubtedly prompted the Code's drafters, consistent with the Code's endorsement of the principle of freedom of contract, to make express provision for the limitation or exclusion of such damages. For certain sellers, exposure to liability for consequential damages could drastically affect the conduct of their business, causing them to increase their prices or limit their markets. ... In a commercial setting, the seller's right to exclusion of consequential damages is recognized as a beneficial risk-allocation device that reduces the seller's exposure in the event of breach.

*Kearney,* 527 A.2d at 433. A Rheem executive testified that such exclusions of consequential damages are standard in the gas-powered furnace industry. (R. at 102.)

**9.** Phelps argues that the dependent view "more accurately reflects the parties' intent" because it is what a "rational buyer" would expect. Appellee's Br. in Opposition to Transfer at 6. However, this type of "presumed" intent is no substitute for an analysis of the parties' actual expectations.

should not interfere simply because such risks have materialized. This is the view shared by Professors White and Summers:

> In general we favor the [independent] line of cases. Those cases seem most true to the Code's general notion that the parties should be free to contract as they please. When the state intervenes to allocate the risk of consequential loss, we think it more likely that the loss will fall on the party who cannot avoid it at the lowest cost. This is particularly true when a knowledgeable buyer is using an expensive machine in a business setting. It is the buyer who operates the machine, adjusts it, and understands the consequences of its failure. Sometimes flaws in such machines are inherent and attributable to the seller's faulty design or manufacture. But the fault may also lie in buyer neglect, in inadequate training and supervision of the operators or even in intentional use in ways forbidden by the seller. Believing the parties to know their own interests best, we would leave the risk allocation to the parties.

White & Summers, Uniform Commercial Code § 12–10, at 605 (3rd ed.1988) (hereinafter "White & Summers"). *See also S.M. Wilson & Co. v. Smith Intern., Inc.*, 587 F.2d 1363, 1375 (9th Cir.1978) ("Risk-shifting is socially expensive and should not be undertaken in the absence of a good reason. An even better reason is required when to so shift is contrary to a contract freely negotiated."); *Polycon Indus., Inc. v. Hercules, Inc.*, 471 F.Supp. 1316, 1325 (E.D.Wis.1979) ("[T]he exclusion of consequential and special damages was an allocation of risks agreed to between two commercial parties of equal strength and should be given effect.").

Phelps attempts to escape this conclusion by arguing that the furnace sales were not a sophisticated commercial trans-

action worthy of such deference. Appellee's Br. in Opposition to Transfer at 8. Phelps notes that the warranties were simply found inside of the furnace box and were not the product of detailed negations. *Cf. American Electric Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435 (S.D.N.Y.1976). Phelps's argument here may prove too much, *i.e.*, that only the ultimate customer, and not Phelps at all, was to benefit from the warranty. If Phelps is a beneficiary of the warranty (as we have noted both parties appear to assume), Phelps cannot escape the conclusion that these goods were relatively sophisticated and flowed between businesses entities. *See, e.g., S.M. Wilson*, 587 F.2d at 1375 ("Parties of relatively equal bargaining power negotiated an allocation of their risks of loss. ... The machine was a complex piece of equipment designed for the buyer's purposes."). This context is far different than those confronted in the many dependent cases that focus on losses suffered by consumers at the hands of large commercial entities. *See, e.g., Kelynack v. Yamaha Motor Corp.*, 152 Mich. App. 105, 394 N.W.2d 17, 21 (1986); *Goddard v. General Motors Corp.*, 60 Ohio St.2d 41, 14 O.O.3d 203, 396 N.E.2d 761, 765 (1979).

The Court of Appeals applied the independent view, but found a genuine issue of material fact as to whether "the cumulative effect of Rheem's actions was commercially reasonable." *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 714 N.E.2d 1218, 1228 (Ind.Ct.App.1999). The court pointed to no statutory authority that requires these exclusions or limitations to be "commercially reasonable," nor did it define this term.[10] The court did make some passing references to Official Comment One to § 2–719, which assures a buyer an "adequate" remedy in the face of

---

**10.** The UCC does refer to "reasonable com- mercial standards" in defining what is "good

a breach of warranty. *Id.* at 1228 ("We remain mindful that even as Comment 1 to Ind.Code § 26-1-2-719 advises that 'reasonable agreements limiting or modifying remedies are to be given effect,' the next sentence also cautions that 'it is of the very essence of a sales contract that at least minimum adequate remedies be available.' "). This comment, however, makes no reference to commercial reasonableness. Indeed, the court stated frankly that its primary concern was with the "fairness of the outcome" and reaching an "equitable result." *Id.* In light of our conclusion that the legislature intended the independent view to apply to these circumstances,[11] we are constrained to reject the commercial reasonableness test applied by the Court of Appeals and to reverse the trial court's denial of summary judgment on Phelps's claims for incidental and consequential damages.[12]

## II

Rheem next argues that the trial court erred by denying summary judg-

---

faith" for a merchant. Ind.Code § 26-1-2-103(b) (1993). The UCC in turn "imposes an obligation of good faith in [a contract's] performance or enforcement." *Id.* § 26-1-1-203. However, the limitations and exclusions at issue here were added to the contract during *formation*, and § 1-203, which covers only *performance* or *enforcement*, is inapplicable. No other UCC provision purports to place a duty of "commercial reasonableness" on a party's ability to contract.

**11.** We note, however, that some language in Professors Pratter and Townsend's Indiana Comments to Indiana Code § 26-1-2-719 arguably suggests that the commentators subscribed to the dependant view: "A statutory scheme of remedies, if well drafted, should be adequate for a great variety of situations. But the parties' substitute arrangement may fail, in unusual circumstances. If so, *the statutory remedies will still be available.*" Indiana Comment to Ind.Code § 26-1-2-719 (Burns 1974) (emphasis added).

**12.** As a final matter, we note that our holding today is consistent with a pre-UCC Indiana case that arguably gave effect to an exclusion of consequential damages when a limited remedy failed of its essential purpose. *Nave v. Powell* centered on the sale of a stallion named "Major McKinley." 52 Ind.App. 496, 96 N.E. 395, 399 (1911). Although Powell purchased the horse for breeding, Major McKinley proved to be "barren and unprolific" after "60 fruitful mares were bred to him ... none of which were gotten in foal." *Id.* at 397. Powell argued that Nave had "impliedly warranted said horse to be fit and suitable for breeding purposes and a reasonably sure foal-getter" because Nave knew the horse was purchased for breeding. *Id.* Nave countered with contractual language that he claimed limited Powell's remedy to a substitute horse:

> In the event that the above-named stallion, in perfect health, with proper usage, and the mares to him regularly returned and tried or bred on one full service season's trial does not get with foal 50 [percent] of the producing mares regularly tried and bred to him, then on return of the said stallion to me ... I agree to furnish the above-named purchaser without further charge, another imported or pure bred stallion of equal quality in exchange.

*Id.* at 397. The contract also stated that "[s]hould the above-named stallion hereafter become injured or disabled through accident or disease ... this warranty shall be null and void and of no effect and all obligations incurred by me herein shall be considered fulfilled and ended." *Id.* at 400. These clauses arguably limited the damages Powell could claim for breach of the warranty. Unfortunately, Major McKinley died before Powell could return him to Nave and request a replacement, as the warranty required. *Id.* at 398. Despite the contract's limited remedy and exclusion of damages, Powell sued for the expense of feeding and stabling Major McKinley and the cost of advertising the stallion's services. Powell also sought compensatory damages in the form of the difference in value between the sterile stallion he received and the fair market price of a fertile stallion. *Id.* The Court of Appeals recognized that contracting parties may limit the remedies available for the breach of warranty:

> It must not be forgotten that in contracts of warranty, the same as in all other contracts, the contracting parties have a perfect right to put into such contract all its terms and

ment on Phelps's claims for labor expenses incurred in fixing its customers' furnaces. The record shows that Phelps lost nearly $100,000 by servicing Rheem furnaces under a service labor warranty that Phelps gave to its customers.[13] Rheem argues that a "service labor exclusion" found in the express warranty prevents Phelps from claiming damages in this form: "This Warranty does not cover any labor expenses for service, nor for removing or reinstalling parts. All such expenses are your responsibility unless a service labor agreement exists between you and your contractor." (R. at 105.) Phelps counters by arguing that this remedy clause failed of its essential purpose and therefore Phelps could claim all UCC damages.[14]

The first step in determining whether a limited remedy failed of its essential purpose is to parse out exactly what purpose the remedy was to serve. *See Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1086 (Ind.1993). While the parties, the trial court, and the Court of Appeals make no reference to this inquiry,[15] both the terms of the warranty and the record illuminate the remedy's purpose. The limitation is addressed to the end-user, warning them that they must look to the contractor for repairs: "All such expenses are your responsibility unless a service labor agreement exists between you and your contractor." (R. at 105.) Further, a Rheem officer testified that the "custom, practice and standard method of dealing in the gas furnace industry is that the manufacturer's warranty is for parts only and excludes reimbursement for labor expenses for service or for removing or installing parts, consequential

conditions, and provide all and entire the remedies contemplated and agreed upon by the parties. ... When the parties do agree upon such remedies and their contract by its terms expresses a clear intent and purpose in that respect, they are bound thereby and limited to the remedies, or remedy, so provided.

*Id.* at 398. The court then held that the warranty limited Powell's remedies to a replacement horse and reversed the trial court's refusal to dismiss the complaint. *Id.*

13. Evidence in the record suggests that the repairs may have been made to help Phelps maintain goodwill with its customers and not to comply with its warranties. Phelps argued in its brief that its warranty did not cover the quality of the furnaces, but merely warranted the quality of the services it provided. Rheem replied that this characterization by Phelps means that the repairs were made gratuitously and Indiana law precludes indemnification for voluntary payments. *See Vernon Fire & Cas. Ins. Co. v. Graham*, 166 Ind.App. 509, 510, 336 N.E.2d 829, 830 (1975) ("Indemnity does not cover losses for which the indemnitee is not liable, but which he voluntarily pays."). Rheem points to testimony that the warranties were only "part" of the reason Phelps made the repairs and that "customer

goodwill" was also a factor. (R. at 172–73.) However, other evidence shows that Phelps gave "one-year labor warranties on all new installations of furnaces" (R. at 166) which included a one-year warranty on labor and a one-year warranty on parts. The complaint itself stated that "Phelps had a contractual obligation [to its customers] to remedy the defects of the furnaces." In reviewing a summary judgment order, we view the facts in the light most favorable to the non-moving party. *See Havens v. Ritchey*, 582 N.E.2d 792, 795 (Ind.1991). Therefore we must assume that Phelps did in fact fix the furnaces in order to comply with its warranties and not as a means of preserving customer goodwill.

14. The UCC applies to these service labor issues because the "predominant thrust" of the entire transaction was clearly a sale of goods. *See Insul–Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 554 (Ind. 1993) (holding that to determine whether a contract is for the sale of goods or the rendition of services, courts must look to the predominant thrust of the transaction).

15. In fact, the Court of Appeals rendered no *holding* as to the service labor issues, even though it attempted to set out the arguments involved. *See Rheem*, 714 N.E.2d at 1231.

and incidental damages." (R. at 102.) Similarly, the president of Phelps testified that "standard procedure throughout the industry was that a dealer would supply a one-year warranty for labor. And then the parts, depending on the manufacture[r] ... usually had a one-year warranty ...." (R. at 165, 174.) In addition, Phelps at one time marketed extended service warranties as part of its business.

These facts demonstrate that the limited remedy was intended to maintain a reasonable division of responsibilities between the manufacturer and the contractor when customers experienced problems. Rheem's parts-only warranty worked in tandem with Phelps's labor warranties to let customers know that they had to seek repair service from the local contractor, not the distant manufacturer. Phelps benefited from this relationship by marketing extended warranties on top of its one-year service warranty. If the warranty held *Rheem* liable for repairs, Rheem would naturally skip over Phelps and sell extended service warranties directly to the customer. For its part, the limited remedy gave Rheem the reassurance that it would not be liable for repairs on its furnaces at distant locations around the country. With this limitation in place, customers could rely on local repair service, Phelps could market extended warranties, and Rheem could be sure it would not be obligated to make repairs. Thus the apparent purpose of this limited remedy was to facilitate the manufacturer/contractor distinction for the benefit of all parties.

 We must next determine whether circumstances caused the remedy to fail of this purpose. We set out the basic framework for analyzing the failure of essential purpose in *Martin Rispens*:

Commentators have suggested that § 2–719, as it relates to failure of essential purpose, is not concerned with arrangements which were oppressive at the inception which is a question of unconscionability, but with the application of an agreement to "novel circumstances not contemplated by the parties." White & Summers, § 10–12. In addition, they have suggested that this provision should be triggered when the remedy fails of its essential purpose, not the essential purpose of the UCC, contract law, or of equity. *Id.* One author suggests that the method used to decide whether a particular limitation fails of its essential purpose is to identify the purpose underlying the provision and determine whether application of the remedy in the particular circumstances will further that purpose. If not, then, and only then, is there a failure of essential purpose. Jonathan A. Eddy, *On The "Essential" Purposes of Limited Remedies: The Metaphysics of UCC § 2–719(2)*, 65 Cal.L.Rev. 28, 36–40 (1978).

621 N.E.2d at 1086. *See also* Indiana Comment to Ind.Code § 26–1–2–719 (Burns 1974) ("[T]he parties' substitute arrangement may fail, in *unusual circumstances*.") (emphasis added); White and Summers, § 12–10 at 602. ("There are probably relatively few situations where a remedy can fail of its essential purpose.").

Using this analysis, we hold that the remedy served its purpose. Rheem, as the manufacturer, had technical expertise in the functioning of its product. It was reasonable for Phelps to expect Rheem to use this expertise to supply replacement parts and technical guidance in the event of malfunctions.[16] Phelps, as the contractor, had

---

**16.** There is nothing in the record to suggest that Rheem failed to deliver replacement parts.

the manpower and facilities to implement these fixes in the field. It was reasonable for Rheem to expect Phelps to use these tools to go into local homes and offices to fix the furnaces. With the extended warranties, Phelps could even profit through this process. By supplying technical guidance and replacement parts, Rheem's limited remedy lived up to the purpose it was designed to serve. *See Martin Rispens,* 621 N.E.2d at 1086.

■ Phelps's main argument as to the failure of essential purpose is that the furnaces experienced problems for roughly four years. However, the purpose of the limited remedy was not to guarantee that every furnace would be easily fixed, but to guarantee that the most logical party would be charged with making the repairs. Phelps was that party, and under this limitation it accepted the risk that repairs would be difficult and labor intensive. In *Martin Rispens,* we stated that a limited remedy fails only in the face of " 'novel circumstances not contemplated by the parties.' " 621 N.E.2d at 1085 (citation omitted). As Comment One to Indiana Code § 26–1–2–719 puts it, a limited remedy fails when its application "operates to deprive either party of the substantial value of the bargain." Thus a limited remedy fails of its essential purpose when an unexpected circumstance arises and neither party accepted the risk that such circumstance would occur. *See Osgood v. Medical, Inc.,* 415 N.W.2d 896, 902 (Minn.App. 1987) ("This case involves the allocation of risks between two merchant manufacturers. That is exactly the intended effect of the Special Terms. We will not apply [2–719(2)] to overturn that result when the case involves the allocation of risk between two merchant manufacturers."); *V.M. Corp. v. Bernard Distributing Co.,* 447 F.2d 864, 865 (7th Cir.1971) ("§ 2–719 was intended to encourage and facilitate con-sensual allocations of risk associated with the sale of goods. This is particularly true where commercial, rather than consumer sales are involved. Even where the defects of the goods cause substantial difficulties to those involved in wholesale and resale distribution, § 2–719(2) need not automatically require disregard of the particular limitation . . . .").

Even if we were to find that this remedy failed of its essential purpose, Phelps would not be entitled to the damages it seeks under the warranty. The parties characterize these service repair costs as either consequential damages or direct damages. In either event, Phelps is not entitled to recovery under the warranty and summary judgment should be entered.

■ The parties characterize the service labor as a form of consequential damage because Rheem should have foreseen that its failure to provide functioning furnaces would have caused Rheem to make multiple repairs under its service warranty. See Ind.Code § 26–1–2–715 (1993). To the extent these repair costs were consequential damages, they are excluded by Rheem's warranty as discussed in Part I, *supra.*

■ The parties also characterize the repair costs as a form of direct damages. A buyer's remedy for breach of warranty is typically the difference between the goods as warranted and the goods as accepted. See Ind.Code § 26–1–2–714(2) (1993). However, the cost of repair may serve as a proxy for direct damages. *See, e.g., Jones v. Abriani,* 169 Ind. App. 556, 350 N.E.2d 635, 646 (1976) ("In this case, one reasonable way of measuring the difference in the value of the goods between what was actually delivered (a defective mobile home) and what was warranted (a mobile home with the defects repaired) is the cost of repairing the defects."), *Schroeder v. Barth, Inc.,* 969 F.2d

421, 424 (7th Cir.1992) (applying Indiana law).[17] Phelps argues that it should be able to recover the cost of repairing the furnaces in the event that the limited remedy failed of its essential purpose.

■ We hold, however, that Phelps is not in a position to claim this form of remedy. Typically, a buyer claiming repair damages is suing its immediate seller. *See, e.g., Abriani,* 350 N.E.2d at 646. Recovering the repair cost replicates the typical warranty damages—value of goods as warranted minus value of goods as delivered—by awarding the amount spent to put the goods in the warranted condition. *See* White and Summers, § 10–2 at 504. This measure of damages reflects the fact that a properly functioning market would deduct from the price of the item the cost of repairs a purchaser would have to make. The repair costs that Phelps seeks to recoup serve no such purpose because Phelps is not in possession of the goods.

■ We conclude by noting that, while Phelps, as an intermediate seller, is not entitled to these direct warranty damages, it may have a claim sounding in indemnity or subrogation for damages suffered by those with which it shared privity. *See, e.g., Black v. Don Schmid Motor, Inc.,* 232 Kan. 458, 657 P.2d 517, 529 (1983) ("A right of indemnity exists where a party is compelled to pay damages that rightfully should have been paid by another party. 41 Am.Jur.2d, Indemnity, § 20. Thus, a seller that is liable for damages to a purchaser of defective goods may seek indem-

nity from the manufacturer where the damages were the proximate result of the manufacturer's breach of warranty."). Whether or not Phelps can recover on an indemnity theory is an issue to be decided on remand.

### III

We summarily affirm the Court of Appeals as to Phelps's implied warranty claims. See *Martin v. Amoco Oil Co.,* 696 N.E.2d 383, 386 n. 4 (Ind.), *cert. denied, Zrnchik v. Amoco Oil Co.,* 525 U.S. 1049, 119 S.Ct. 608, 142 L.Ed.2d 548 (1998).

### Conclusion

Having previously granted transfer, we reverse the order of the trial court on Phelps's express warranty claims and remand this case for proceedings consistent with this opinion.

SHEPARD, C.J., and BOEHM, J., concur.

RUCKER, J., not participating.

DICKSON, J., dissents with separate opinion.

DICKSON, Justice, dissenting.

I am persuaded that Indiana Code § 26–1–2–719(2) should be construed to invalidate an exclusion of consequential damages when a limitation of remedy fails of its essential purpose. I further conclude that the trial court properly denied Rheem's motion for summary judgment as to Phelps's claims for labor expenses in-

---

17. The New Mexico Court of Appeals explained this process in *Manouchehri v. Heim:*

[Although 2–714] sets the measure of direct damages for breach of warranty as the difference between the value of the goods as warranted and the value of the goods as accepted, often that difference can be approximated by the cost to repair the goods so that they conform to the warranty. For

example, if it costs $200 to fix [a] machine so that it performed as a 100/100 machine, then one could assume that the unrepaired machine (the "goods accepted") was worth $200 less than the repaired machine (the goods "as warranted"). Thus, the cost of repair is commonly awarded as the direct damages.

123 N.M. 439, 941 P.2d 978, 981 (Ct.App. 1997).

curred in fixing its customers' furnaces. Phelps is entitled to a trial on whether Rheem's "service labor exclusion" failed of its essential purpose, an issue of fact and not law.