**D & M HEALTHCARE, INC., Extendicare Homes, Inc., Indiana Health & Rehabilitation Centers, G.P., Kindred Nursing Centers, L.P., and Indiana Health Care Association, Inc., Appellants–Plaintiffs,**

v.

**Frank O' BANNON, in his official capacity as Governor of the State of Indiana, Indiana Family and Social Services Administration and its Office of Medicaid Policy and Planning, John Hamilton, in his official capacity as Secretary, Indiana Family and Social Services Administration, and Melanie Bella, in her official Capacity as Director, Office of Medicaid Policy and Planning, Appellees–Defendants.**

No. 49A05–0301–CV–26.

Court of Appeals of Indiana.

Aug. 13, 2003.

Transfer Granted Oct. 2, 2003.

J. Michael Grubbs, Peter J. Rusthoven, Thomas F. Shea, Julie C. Sipe, Barnes & Thornburg, Indianapolis, IN, Attorneys for Appellants.

Steve Carter, Attorney General of Indiana, Gary Damon Secrest, Chief Counsel, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

## OPINION

MAY, Judge.

D & M Healthcare and a number of other nursing facilities ("the nursing homes") sought a declaratory judgment that a bill limiting the authority of the Indiana Family and Social Services Administration ("FSSA") to reduce Medicaid reimbursement rates became law notwithstanding the governor's veto, and that rules to that effect adopted by FSSA are invalid because they violated that law. The nursing homes' request was denied. They raise two issues on appeal, which we consolidate and restate as:

1. Whether a constitutional requirement that a vetoed bill shall be returned by the governor to the legislature on the first day of the next session is satisfied by a return while the legislature is not in session and some six months prior to the first day of the next session; and if not,

2. Whether subsequently-promulgated rules reducing nursing home reimbursement from Medicaid are invalid.

We reverse.

## FACTS

On April 29, 2001, the general assembly passed House Bill 1866, which provided that FSSA could not act without statutory authority to reduce Medicaid reimbursement to nursing homes. The bill provides in pertinent part that

(a) The office of the secretary of family and social services established by IC 12–8–1–1 may not do any of the following:

(1) Repeal 405 IAC 1–14.6 [establishing rate-setting criteria for nursing facilities].

(2) Amend 405 IAC 1–14.6 in any manner that reduces reimbursement for nursing facilities or adopt any other rule under IC 4–22–2 [governing administrative rulemaking] that reduces reimbursement for nursing facilities without statutory authority for the amendment.

The general assembly adjourned on April 29, 2001. On May 11, 2001, the governor vetoed the bill and returned it to the House. The House, having adjourned on April 29, was not in session on the day the bill was returned. The next day the House was in session was November 20, 2001, its "organization day." The House was not in session after organization day until January 7, 2002,[1] which was its first regular meeting day of the session. The House voted on March 14, 2002 not to override the veto. FSSA subsequently adopted five rules that reduced reimbursement for nursing homes.

The trial court determined the governor's veto was effective and that House Bill 1866 did not become law. It accordingly denied the nursing homes' motion for a declaratory judgment that the bill had become law. It also declined to find invalid the rules adopted subsequent to the

---

1. FSSA asserts in its Statement of the Facts that the Governor did not return the vetoed bill on Organization day "because he had returned the bill six months earlier, on May 11, 2002." (Br. of Appellee at 3.) The record reflects the bill was returned on that date in 2001, not 2002.

passage of the bill and declined to enjoin FSSA from implementing and enforcing the rules.

## DISCUSSION AND DECISION

### Standard of Review

■ When, as here, a trial court's decision is based on stipulated facts, this court is in as good a position as the trial court to determine its force and effect. *Poznic v. Porter County Development Corp.*, 779 N.E.2d 1185, 1188 (Ind.Ct.App.2002). On appeal from a judgment based on stipulated facts there exists no presumption in favor of the trial court's decision. *Id.* Thus, our review of the trial court's decision is *de novo.* *Id.*

### 1. The Veto

Article V, § 14(a)(2) of the Indiana Constitution (the "adjournment veto clause") provides in pertinent part:

(a) Every bill which shall have passed the General Assembly shall be presented to the Governor. The Governor shall have seven days after the day of presentment to act upon such bill as follows:

(1) He may sign it, in which event it shall become a law.

(2) He may veto it:

\* \* \*

(D) In the event of a veto after final adjournment of a session of the General Assembly, such bill *shall* be returned by the Governor to the House in which it originated *on the first day that the General Assembly is in session after such adjournment,* which House shall proceed in the same manner as with a bill vetoed before adjournment ... [*i*] *f such bill is not so returned, it shall be a law notwithstanding such veto.*

(Emphasis supplied.)

■ FSSA does not argue that the Governor's veto of House Bill 1866 complied with that constitutional provision, but rather asserts there was no constitutional violation because the purposes underlying the adjournment veto clause to ensure the legislature has the opportunity to consider a veto and nevertheless pass the bill into law were satisfied.

■ We decline FSSA's invitation to so interpret the mandatory language of this clear and unambiguous provision of our constitution. "[C]onstitutions import the utmost discrimination in the use of language, and courts are not warranted in substituting for the clear language of the instrument their own notions of what it should have been." *Woessner v. Bullock,* 176 Ind. 166, 93 N.E. 1057, 1059 (1911).

> The authorities agree that the words used in the Constitution must be presumed to have been carefully chosen so that each word would have a meaning. It has been said that each word must be thought of as having been deliberately selected and intentionally placed as though it had been hammered into the instrument. Each word therefore must be given effect[.]

*Hendricks v. State ex rel. N.W. Ind. Crime Comm'n, Inc.,* 245 Ind. 43, 51–52, 196 N.E.2d 66, 70 (1964) (quoting *Chadwick, Treasurer v. City of Crawfordsville,* 216 Ind. 399, 409, 24 N.E.2d 937, 942 (1940)).

With regard to provisions regarding the veto power in particular, Judge Achor noted in his concurring opinion:

> Since the Indiana Constitution provision granting veto power of the Governor has been transferred from the Legislative branch of the government to the Executive branch of our government, it is

merely a limitation on the power fundamentally vested in the Legislature. Such limitation should therefore be exercised only as it is expressed in clear and unambiguous terms within the constitutional provision, itself.

*Id.* at 59, 196 N.E.2d at 73 (Achor, J., concurring).

In *Whitcomb v. Young*, 258 Ind. 127, 138, 279 N.E.2d 566, 574 (1972), our supreme court noted courts should use the same rules of construction in interpreting a constitutional amendment as is used in construing a statute:

> One such is that extrinsic evidence which attempts to establish legislative intent, can be used only in the case of an enactment or amendment to a constitution which is ambiguous on its face. On the other hand, when a statute or amendment to a constitution is clear, then no extrinsic evidence may be admitted as to legislative intent.... The erroneous use of extrinsic evidence in this situation would foster ambiguity where none exists.

FSSA directs us to no ambiguity in this constitutional provision and we find none. We therefore decline to "foster ambiguity where none exists," and we find the bill became law pursuant to the clear language of Article V § 14 notwithstanding the governor's veto.

Even if construction or interpretation of this section were appropriate, we note that a strict interpretation of the provision is consistent with the stated purpose of the revision that led to the current wording of that section. Prior to 1972, the constitutional section at issue here provided the governor was to return a bill within three days after it was presented to him or it would become law without his signature. If, due to adjournment, he could not so return the bill, it would become law without his signature unless, within five days after adjournment, he filed it with the Secretary of State. The Secretary of State was required to "lay the same before the general assembly, at its next session, in like manner as if it has been returned by the governor." Ind.Code Ann. Const. Art. V § 14 Historical Notes (West 1999).

The 1972 amendment that governs the case before us required the bill be returned by the governor, not the Secretary of State, and added the requirement that the bill be returned "on the first day that the General Assembly is in session after such adjournment." The official report of the Constitutional Revision Commission explicitly notes certain questions that had been left unanswered by the plain language of the earlier constitutional provision and our decision in *State ex rel. Mass Transp. Authority of Greater Indianapolis v. Ind. Revenue Bd.*, 144 Ind.App. 63, 242 N.E.2d 642 (1968), *trans. denied* 251 Ind. 607, 244 N.E.2d 111 (1969).

Specifically, the Commission noted, there were unresolved questions about the timing of the veto process including the question "Should the governor return vetoed legislation during a recess or wait until the first day in session? The proposed amendment answers each of these questions." Ind. Legis. Council, *Report of Constitutional Revision Comm'n* at 11 (1970) (App. at 117). The drafters undoubtedly intended to establish a date certain for the return of vetoed bills and we decline to construe the constitutional provision in such a manner as to render that language meaningless.

■ It has long been established that the words used in a constitution "should be taken in their literal signification, unless, by giving them such signification, the meaning of the instrument is rendered doubtful, or it is made to lead to possible oppression or injustice, or to contradictions

or absurd results." *May v. Rice*, 91 Ind. 546, 555 (1883). We find no oppression, injustice, contradiction or absurdity in the requirement that the governor return a vetoed bill on the first day of the next session, and accordingly hold House Bill 1866 became law notwithstanding the governor's veto pursuant to the plain and unambiguous language of Art. V § 14.

### 2. *Validity of the Rules*

■ The nursing homes argue the five rules promulgated by FSSA are invalid because they violate House Bill 1866. FSSA argues that if House Bill 1866 became law, it is invalid as an impermissible "amendment by implication" (Br. of Appellee at 15) of the existing statutory scheme governing Medicaid reimbursement.

■ "The repeal[2] of statutes by implication is not a favored result under Indiana law. Such repeal will only occur if it is clear that the statutes are so inconsistent that it must be assumed the General Assembly did not intend that both remain in force." *Schrenker v. Clifford,* 270 Ind. 525, 528, 387 N.E.2d 59, 60–61 (1979) (footnote supplied). If at all possible, we will adopt a construction that will permit both laws to stand. *N. Ind. Pub. Serv. Co. v. Citizens Action Coalition of Ind., Inc.,* 548 N.E.2d 153, 159 (Ind.1989). We see no inconsistency in House Bill 1866 and the statutes establishing FSSA's general rule-making authority, and we believe the statutes before us can be construed so that all can stand.

In determining the validity and meaning of this statute we are guided by a number of well-established principles of statutory construction, all of which lead us to conclude House Bill 1866 is valid and the regulations promulgated by FSSA in violation of it are invalid. A reviewing court's main objective in statutory construction is to determine, effect and implement the intent of the legislature. *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.,* 746 N.E.2d 941, 948 (Ind.2001). In ascertaining this intent, we presume the legislature did not enact a useless provision. *Id.* If possible, we interpret a statute so that every word has effect and meaning; no part will be rendered meaningless if it can be reconciled with the rest of the statute. *Id.*

House Bill 1866 provides in pertinent part that FSSA cannot amend or promulgate a Medicaid rule that "reduces reimbursement for nursing facilities without statutory authority for the amendment." FSSA's apparent construction of House Bill 1866 that the "statutory authority" referred to in the bill already exists— would render meaningless the reference in the bill to "statutory authority" and would strip the entire bill of any effect.

The rules FSSA adopted after the bill became law listed as their statutory authority Ind.Code §§ 12–8–6–5, 12–15–1–10, and 12–15–21–2. Section 12–8–6–5 provides generally that FSSA may adopt rules to "implement … the state Medicaid program." Section 12–15–1–10 also provides generally that the FSSA secretary and office may adopt rules "necessary to carry out the Medicaid program[.]" Section 12–15–21–2 provides the FSSA secretary shall, with the advice of medical staff, adopt rules consistent with title nineteen of the federal Social Security Act[3] and

---

**2.** The same rule applies to amendment of statutes by implication. See 82 C.J.S. *Statutes* § 245 (1999).

**3.** That statute requires in pertinent part that state programs provide:

for a public process for determination of rates of payment under the plan for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded under which

regulations promulgated thereunder. None of those statutes explicitly permit or prohibit FSSA rules that reduce reimbursement rates for nursing homes. If, as FSSA argues, it "has always had statutory authority to adopt the challenged Medicaid nursing home rules" (Br. of Appellee at 11), then the legislature, in passing House Bill 1866, enacted a "useless" and "meaningless" provision, *Rheem*, 746 N.E.2d at 948. We must decline to attribute to our legislature such a purpose.

■ We also recognize a strong presumption that when the legislature enacts legislation it is aware of existing statutes relating to the same subject. *Poehlman v. Feferman*, 717 N.E.2d 578, 582 (Ind.1999), *reh'g denied*. We accordingly decline to hold that FSSA's pre-existing statutory authority to promulgate Medicaid rules supplied the "statutory authority" House Bill 1866 requires before FSSA reduces nursing home reimbursement. That interpretation would render pointless the legislature's new and explicit requirement of such statutory authority.

■ Finally, it is well-established that when two statutes conflict, a statute dealing with a subject in a specific manner controls over a statute dealing with the same subject in general terms. *Turner v. Bd. of Aviation Comm'rs*, 743 N.E.2d 1153, 1160 (Ind.Ct.App.2001), *trans. denied* 761 N.E.2d 413 (Ind.2001). If, as FSSA's argument assumes, House Bill 1866 is in conflict with the Indiana statutes authoriz-ing Medicaid rulemaking, the provisions in House Bill 1866 and the statutes on which FSSA relied as authority for its rules are properly categorized as respectively specific and general. FSSA undoubtedly has general statutory authority to promulgate Medicaid rules. However, none of those general rulemaking statutes confer on or deny to FSSA specific authority to reduce reimbursement. The specific and express prohibition in House Bill 1866 of such reduction therefore controls over statutes that provide only general rulemaking authority.

House Bill 1866 may be reconciled with pre-existing Medicaid statutes; the rules FSSA promulgated after its passage are therefore invalid.

### CONCLUSION

House Bill 1866 became law notwithstanding the governor's veto. It was not an impermissible "amendment by implication" of the pre-existing statutory scheme governing Medicaid reimbursement, and the regulations FSSA promulgated in violation of its provisions are invalid. We accordingly reverse.

KIRSCH, J., and BAILEY, J., concur.

---

(i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,
(ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,
(iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and
(iv) in the case of hospitals, such rates take into account (in a manner consistent with section 1396r–4 of this title) the situation of hospitals which serve a disproportionate number of low-income patients with special needs[.]
42 U.S.C. § 1396.